[Civil No. 3890.   Filed December 6, 1937.]

[74 Pac. (2d) 43.]

JAMES R. DUNSEATH, Appellant, v. TUCSON GOLF & COUNTRY CLUB, a Corporation, and MARY H. CANNEY, a Widow, Also Known as M. CANNEY, Appellees.

Mr. James Elliott Dunseath, for Appellant.

Mr. Arnold T. Smith, for Appellee Canney.

ROSS, J.—This is a foreclosure action by James R. Dunseath, assignee, against the Tucson Golf & Country Club, a corporation, as mortgagor, and Mary H. Canney who it is alleged claims some title or interest in the mortgaged premises. The mortgagor, to which we shall refer as the club, made no defense to the action. Canney answered that she was the owner of the mortgaged premises having acquired title through sheriff's deed; denied that there was anything owing plaintiff from the club by reason of the mortgage; alleged that the said mortgage was made without consideration and to hinder, delay, and defraud the creditors of the mortgagor.

The case was tried with a jury to which was submitted a number of written interrogatories, the answers to which were that the mortgagee paid no con-

sideration for the mortgage and that the purpose of the mortgage was to hinder and delay creditors of the mortgagor. The court's findings were to the same effect. The judgment was that the mortgage was null and void as against defendant Canney's title to the premises; that plaintiff take nothing, and that defendant have judgment for her costs, etc.

The plaintiff has appealed.

The salient facts, and those important to a decision of the questions raised on this appeal, are as follows: In October, 1931, the club was indebted in the sum of $35,000 to the Consolidated National Bank of Tucson, secured by a mortgage on its land and improvements. As this indebtedness was about to mature, it became necessary that the club make arrangements to care for it. It did so by borrowing $33,200 from the Southern Arizona Bank & Trust Company, $30,000 of which was secured by a first mortgage on its land and improvements (except a strip of 230 feet on the east end running the entire width) and for the balance of $3,200 the club gave the bank six notes for $533.33 each and each of these notes had an indorser whose identity will appear later on. The club owned 120 acres and the $30,000 mortgage covered all of it except the strip mentioned above. This strip, of about 12 acres, had been subdivided into lots, which it was the intention of the club to sell for homesites and apply the proceeds to the liquidation of its debts. The six unsecured notes were renewed from time to time.

On September 17, 1932, the club's board of directors authorized and directed its president and secretary to obtain a loan from the "Southern Arizona Bank & Trust Company, or such other persons as they may designate," of $10,000, payable in three years, and to deliver to the person or persons loaning the money the club's notes secured by mortgage on its property.

On October 29, 1932, the club's president and secretary delivered to the Southern Arizona Bank & Trust Company its four notes for $2,500 each, payable five years after date, secured by mortgage on the east 230-foot strip. This mortgage was recorded at the request of James R. Dunseath, the plaintiff, May 11, 1933, more than six months after its date.

On April 4, 1933, the club's board of directors authorized the president and secretary

"to have the present mortgage on the 200 feet more or less along the Eastern boundary line of property include the amount owed Messrs. Clyne, Heidel, Burcham, Julian, Dunseath and Murphrey in the sum of $3,200.00."

At its meeting of August 23, 1933, the board of directors of the club discussed "the matter of installing a new water system," its cost, etc. At this meeting Burcham, president, offered to indorse the club's note for $2,000, Julian and Heidel for $1,500 each, and Clyne for $1,000, secured by first mortgage. Thereupon, by resolution, the president and secretary were authorized to execute a mortgage upon the eastern 200-foot strip of the club's property to secure notes not to exceed $11,200, to run for five (in later minutes changed to three) years. The minutes of that date also specify that the previous mortgage for $10,000 and notes were to be satisfied therewith.

On September 29, 1933, the president and secretary of the club gave to the Southern Arizona Bank & Trust Company eighteen notes, totaling $11,200, payable in three years: four for $1,000 each, eight for $500 each, two for $533.34 each, and four for $533.33 each. The mortgage of the same date securing these notes was placed of record in the county recorder's office at the request of plaintiff, Dunseath, on November 4, 1935, more than two years after its date.

Both of the above mortgages and notes, aggregating $21,200, were assigned by the Southern Arizona Bank & Trust Company to the plaintiff for the purpose of bringing suit for their foreclosure and collection. The plaintiff, in his amended complaint, disclaimed any right, by reason of the mortgage dated October 29, 1932, for $10,000, and states it "is of no force or effect in this action" brought to foreclose the mortgage dated September 29, 1933. He prays for judgment for $4,733.31, being the sum of the six notes: four for $533.33 each and two for $533.34 each and interest, and for the sum of $1,000 for taxes and interest and for the foreclosure of the mortgage lien for such sums.

Some time, just when we cannot tell from the record, defendant Canney, an open creditor of the club, brought suit for approximately $5,000 due her on account of wages as stewardess for the club, attached the 230-foot strip at the east end of the club's land, obtained a foreclosure of such attachment lien, and through execution and sale acquired title thereto on August 18, 1936, by sheriff's deed. Apparently no defense to Canney's attachment suit was made by the club or any of its officers or the Southern Arizona Bank & Trust Company.

Upon the trial it was shown that the club was without any assets whatever; that the Southern Arizona Bank & Trust Company had foreclosed its mortgage and sold all of the mortgagor's property except the 230-foot strip involved here.

The oral evidence, as well as the club's records, is to the effect that the mortgage of September 29, 1933, was given by the club to the Southern Arizona Bank & Trust Company to secure what the club "owed" Messrs. Clyne, Heidel, Burcham, Dunseath, and Murphrey, and that the bank in taking the mortgage was acting as the mere trustee of such persons. These are the persons who indorsed the club's notes for

$533.33 and $533.34 and who, it appears, had paid the bank the notes they had indorsed.

All of these parties during the time of these different transactions (except perhaps Murphrey) had served on the club's board of directors and some of them had acted as president thereof. All of them were stockholders or members of the club. The plaintiff, Dunseath, had acted as a director, was also the attorney for the Southern Arizona Bank & Trust Company and for the club, and looked after the legal aspects of the different transactions.

Plaintiff's assignments are that the trial court and jury erred (1) in finding that there was no consideration for the $10,000 notes and mortgage dated October 29, 1932, and that such mortgage was given for the purpose of hindering, delaying, and defrauding the club's creditors; (2) in finding that there was no consideration for the $11,200 notes and mortgage dated September 29, 1933, and that the mortgage was given for the purpose of hindering, delaying, and defrauding the club's creditors; (3) in finding the delay in recording mortgages was for the purpose of hindering, delaying, and defrauding the club's creditors; (4) in finding that defendant Canney owned the real property covered by the mortgages, free and clear of any lien or encumbrance by reason of the mortgages and taxes paid by mortgagee.

There were ten other assignments, some raising immaterial questions and others insufficient under our rules to raise any questions.

The enumerated assignments challenge the sufficiency of the evidence to support the findings. In considering them as we go along we will need to state other facts than those given above.

██ If there is any substantial evidence showing or tending to show that these mortgages were fictitious or were given by the officers of the club to delay and

hinder its creditors, the decision of the jury and trial judge thereon will not be disturbed. Under such assignments, we do not weigh the evidence or undertake to say which way the scales turn. We examine the evidence only for the purpose of ascertaining whether it is sufficient reasonably to authorize or support the conclusions reached by the triers of the facts. That we might have decided it otherwise if sitting as the trier of the facts does not enter into the case.

Some time after October, 1932, the club caused to be mailed to its subscribers and members a circular letter containing this statement:

"We also were fortunate in eliminating from the property covered by the original mortgage twenty-six lots, approximately one hundred by two hundred feet each, along the eastern side of the Country Club tract which we felt should be held in reserve to protect the Club . . . It is necessary under the circumstances to protect the interests of the Club, that a mortgage be placed on the twenty-six lots mentioned, which we are accordingly doing. . . . "

It was about the time of sending this letter that the board of directors and officers of the club got busy giving mortgages on the unencumbered strip of 230 feet "to protect the interests of the Club." This is a very frank and bold statement by the club or its officers. It says, in effect, "We will cover this strip with mortgages to protect it from the club's creditors." What was done to make good this purpose has been detailed. It was proved at the trial, and we think practically admitted by plaintiff, that the first mortgage for $10,000 and the four notes for $2,500 each were without consideration. The board of directors had not authorized the making of any such instruments. There was nothing in the mortgage or the notes to indicate that they were for a past indebtedness. The resolution authorizing the loan was one to run

three years and this one was made to run five years from date. Plaintiff in his pleadings admits that such mortgage was ''of no force or effect.'' Notwithstanding, six months after its date plaintiff lodged it with the county recorder for record. The inquiry might be, Why this delay in recording if the instrument was intended to secure a valid, subsisting loan? But, granting that its execution and recordation were innocent mistakes, the question might be asked why it was not canceled when the mortgage of September 29, 1933, for $11,200 was given, which, it is alleged in plaintiff's complaint ''was issued and executed to take the place of the mortgage . . . of date October 29, 1932.'' It was not canceled of record at all. If in fact the amount owed by the club was $3,200 only, Why a mortgage for $10,000 or $11,200? The excess over $3,200, it was said, was to make improvements and install a water system. Whether that is true or not was for the jury and the trial court to say. The club's board of directors at its meeting of August 23, 1933, seemed to want to take care of the ''new water system'' by a first mortgage to Burcham for $2,000, Julian and Heidel for $1,500 each, and Clyne for $1,000. But the mortgage given was not to secure a note for $2,000 or for $1,500. It would be interesting to know why any bank or banker accepting mortgage security for money actually loaned would delay recording the mortgage for over two years after taking it. The jury and court might have concluded that it was not given to secure payment of a debt owing to the bank but for the purpose of misleading and delaying creditors of the club in the collection of legitimate claims. Anyone examining the county records after the mortgage of September 29th was recorded would have found the 230-foot strip of the club's premises mortgaged for $21,200, bearing interest at 8 per cent. per annum. It required courage and daring to

storm this protecting shield thrown around this little strip of land by the officers of the club.

The plaintiff testified in his own behalf, and on cross-examination said:

"Q. Now, Mr. Dunseath, this eleven thousand, two hundred dollar mortgage is dated September 29th, 1933, and it was not recorded until November 4th, 1935. Will you explain why it was held off of the records for two years and two months? A. Just an object of not doing it.

"Q. Just an object? A. There was no purpose to put it on. There was nothing to secure, nothing. The $3,200.00 didn't amount to any liability, or any lien, on anything. We were expecting to refinance the whole corporation."

This witness made other statements inconsistent with the above but it was for the jury and the court to say which of his statements were true. If the item of $3,200 "didn't amount to any liability, or any lien, on anything," as the plaintiff said, then of course the findings were amply supported. The plaintiff knew because he is a member of the bar and was perhaps more familiar with the club's dealings and liabilities than any other person in the world.

We think the plaintiff literally meant what he said regarding the mortgages and that it was never intended by him or his associate members to secure a lien, for advances they may have made for the club's benefit, superior or prior to the claims for wages of servants and employees of the club, who kept the club and its grounds in condition so that members could enjoy them. Knowing these members of the club as we do, we feel certain they would do no act to prefer themselves as creditors of the club over the woman who for many years catered to and waited upon them with refreshing drinks and food when they were tired from strenuous and exhilarating exercise

on the golf links or from "tripping the light fantastic" to the lilting music of the modern jazz orchestra. The mortgages were to protect the club (debtor) and not these members as creditors.

On well-recognized principles of equity, we do not think officers and directors of insolvent corporations, even though they are *bona fide* creditors and have become such by making advances to the corporation, can vote themselves mortgage security on the corporate assets and thereby secure a preference over other creditors. Their attempt to do so is a violation of their duty as trustees of the corporation, which duty is not "to use the trust property for their own benefit, to the disadvantage of the other creditors." *Shoenthal* v. *New Jersey Gardens Co.*, (N. J. Ch.) 103 Atl. 415; *Wiggington* v. *Auburn Wagon Co.*, (C. C. A.) 33 Fed. (2d) 496, 500. In the latter case it was said:

"It is well settled that the officers and directors of an insolvent corporation hold its assets as a trust fund for the benefit of its creditors, and that they will not be allowed to take advantage of their position, and the superior opportunity of information which it affords, to secure an advantage for themselves over other creditors. [Citing cases.]"

The plaintiff argues that the club was not insolvent; that it had plenty of assets to meet all of its obligations. But the fact is, as the record shows, that it has been in financial straits practically all its entire existence and that it ultimately, because of its inability to meet its debts, lost its property. The annotator's headnote to *Jackman* v. *Newbold*, (C. C. A.) 28 Fed. (2d) 107, 62 A. L. R. 729, reads:

"Director creditors of a corporation insolvent in fact, or so nearly so that insolvency is practically certain, may not appropriate the assets of the corporation to secure or pay a past unsecured indebtedness to the prejudice of other creditors."

■ Defendant Canney was a witness in her own behalf. She testified that Burcham, while president of the club, said to her "that strip of land, those lots were set aside and were free to protect their creditors and I was their largest creditor"; that she had this conversation along about May, 1934; that he repeated practically the same conversation to her some time later. She also testified that Julian, who was a director and part of the time president of the club, told her "that strip was clear and set aside for their creditors . . . that I was taken care of by this strip." Neither of these officers contradicted these statements by the defendant and her testimony stands unimpeached.

■ The plaintiff claims that his assignor, the Southern Arizona Bank & Trust Company, paid the taxes on all the property of the club for the years 1932, 1933, 1934, 1935, and one-half of 1936, and that the proportion of the taxes that the 230-foot strip should bear is $1,000. The mortgage of September 29, 1933, provides that, if the mortgagee should pay the taxes, the amount so expended should be added to the mortgage and be a lien on the premises. According to the evidence, the club's premises were assessed as a whole, and for the years named the mortgagee bank paid the taxes, amounting to about $4,000. The evidence shows that the bank in its suit to foreclose its mortgage for $30,000 included the item of taxes, amounting to $4,078, and obtained judgment therefor against the 120 acres (except the strip of 230 feet) and later sold the property to satisfy the judgment. The mortgagee, having collected the taxes for the years named against the premises covered by its $30,000 mortgage, cannot have judgment again for the same or any part thereof against the 230-foot strip.

We conclude that there was sufficient evidence to support the findings of the jury and the trial court,

and also that plaintiff's assignor had collected from the mortgaged premises the taxes in another action; that therefore, the judgment should be affirmed. It is so ordered.

McALISTER, C. J., and LOCKWOOD, J., concur.