[Civil No. 4630.   Filed April 30, 1945.]

[158 Pac. (2d) 529.]

E. J. STEWART, as Administrator of the Estate of William W. Damron, Deceased, Appellant, v. JACK M. SCHNEPF, and MAUDE SCHNEPF, His Wife, Appellees.

Mr. W. J. Van Spanckeren, for Appellant.

Messrs. Snell, Strouss & Wilmer, and Mr. Richard G. Johnson, for Appellees.

LaPRADE, J.—This is an appeal by the administrator of the estate of William W. Damron, deceased, from a judgment requiring him to specifically perform an alleged oral agreement made by his intestate to convey to Jack M. Schnepf and Maude Schnepf, his wife, certain farm properties in the vicinity of Mesa.

William W. Damron was killed instantly on August 1, 1941, as the result of an automobile collision. For more than twenty years prior to and at the time of his death, deceased was a resident of the State of Kentucky. He left surviving three children, all residents of the State of Kentucky. His son, William Wallace Damron, became the administrator of the estate in Kentucky. The mother of deceased, Elizabeth Damron, a resident of Mesa, also survived him, as did two sisters, Maude Schnepf (one of the appellees) and Lucy Chesley, who are residents of Mesa, and two brothers, Frank L. Damron and Roy Damron.

The Arizona administrator brought the action to quiet the title to certain farm lands and city lots. The defendants named in the complaint are Maude Schnepf, Jack M. Schnepf, her husband, and Gertrude Hall, who was sometimes known as Gertrude Damron. The complaint to quiet title is in the usual form and alleges the ownership of the lands to be in the deceased; that the sole heirs of the deceased were his children; and that the defendants, Jack M. Schnepf, Maude Schnepf, and Gertrude Hall (Damron), claimed some interest in the property.

The amended answer and cross-complaint of the defendants Schnepf admit the death of deceased, and upon information and belief allege that the defendant

Gertrude Hall was, at the time of the death of deceased and prior thereto, the wife of deceased.

Summons was served upon Gertrude Hall, but, upon motion of counsel for the defendants Schnepf and for the defendant Gertrude Hall, the summons was quashed and the action went to the judgment appealed from against the defendants Schnepf, alone.

Appellees, in their amended answer and amended cross-complaint, allege that in February 1936 Schnepf was gainfully employed as a salesman at a salary of approximately $150 per month; that during that month deceased proposed that he and Schnepf should become partners in the acquisition, development, and operation of farms; that Damron agreed to pay the purchase price and finance the operating costs until the properties should become self-sustaining if Schnepf would quit his then employment and devote his entire time to the planting and development of forty acres of citrus and the development and improvement of other ranch properties; alleging further that if Schnepf would do so deceased would ''deed and convey to the said Jack Schnepf and Maude Schnepf a one-half interest in the properties purchased by him under the agreement.''

It is further alleged that all the properties involved in this action were acquired under the agreement. The agreement is alleged to provide that Schnepf should withdraw from the finances furnished by deceased and the income from the ranch property only sufficient funds to sustain life and purchase life's necessities. Full performance by Schnepf is alleged, and, in addition, it is stated that Schnepf and his wife expended upon the property an amount in excess of $3,000 of their separate monies. The prayer of the cross-complaint is that the administrator of the estate of the deceased be required to convey an undivided one-half interest in all the farm properties and the city lots to the Schnepfs.

■■ In our narration of what we consider to be the ultimate facts established by the evidence in this case, we have been guided by principles often repeated in cases decided by this court. These applicable principles are that upon an appeal from a judgment and order denying a motion for a new trial, all reasonable inferences which may be drawn from the evidence supporting the judgment and order appealed from will be so drawn and applied; that all conflicts in the evidence will be resolved in favor of the appellees; and all evidence in the record, unless inherently impossible or improbable, supporting the judgment and order appealed from, is taken as true. *Atlantic Commission Co.* v. *Noe,* 47 Ariz. 123, 53 Pac. (2d) 1088; *Phoenix Title & Trust Co.* v. *Continental Oil Co.,* 43 Ariz. 219, 29 Pac. (2d) 1065; *Mutual Benefit Health & Accident Ass'n* v. *Neale,* 43 Ariz. 532, 33 Pac. (2d) 604; *Broderick* v. *Coppinger,* 40 Ariz. 524, 14 Pac. (2d) 714; *Lillywhite* v. *Coleman,* 46 Ariz. 523, 52 Pac. (2d) 1157. "Where evidence is of such a nature that either of two inferences may be drawn therefrom, we are bound by the one chosen by the trial court." *Collins* v. *Collins,* 46 Ariz. 485, 52 Pac. (2d) 1169, 1173; *Moeur* v. *Farm Builders Corp.,* 35 Ariz. 130, 274 Pac. 1043.

Appellees had a family consisting of six or seven children in 1936, and lived in a home located upon a two-acre tract near Mesa. Appellee Jack Schnepf was then employed by The Arizona Implement Company as a "trouble shooter" and salesman. He earned $150 per month and up, based on a salary and a 5% commission on sales. In addition, he was furnished an automobile, and received an expense account. He had a good job and his chances for advancement were good. Schnepf was an experienced farmer, having followed that vocation practically all his life.

In the spring of 1936, W. W. Damron came to Mesa to visit his mother and his sisters, Mrs. Schnepf and Mrs. Chesley. While in Mesa he lived with his mother

in her home for about two months. After a short time he made inquiry of his mother as to the kind of farmer appellee Schnepf was, if he was capable of running a farm; stating that he (Damron) was interested in buying a farm, that he would like to help appellees, and would buy a farm if they were capable of taking care of it. Mrs. Damron assured her son that Jack was a capable farmer, that he also was a good mechanic, and that he had a wide experience in farming. Damron thereupon proposed to Schnepf that he (Damron) would buy some run-down farms and they would farm them on a partnership basis. Schnepf was to plant forty acres of citrus, put the farms in good condition, and at the end of five years Schnepf was to receive a deed to one-half of the property so acquired and developed. Schnepf accepted this proposition and, with Damron, immediately started looking for some land.

After looking at a number of tracts, they located a 40-acre tract and an 80-acre tract, which Damron purchased. Schnepf immediately quit his employment, and started planting citrus on the 40 acres and putting the 80 acres into cotton. They moved into the old house on the 40 acres and started remodeling it, landscaping the yard, and putting the lands into first-class condition. An account was opened in the Valley Bank at Mesa, designated as the ''W. W. Damron Farms'' account, upon which Schnepf wrote checks. During the first year (1936), 14 acres of the 40-acre tract were planted to citrus, and in 1937 21 additional acres were planted. When the planting was completed in the spring of 1938, there were between 3,600 and 3,900 citrus trees growing. The trees alone cost between $7,200 and $7,800. The income from the 80 acres was insufficient to buy machinery, pay the costs of growing the grove, improving the farms, and give Schnepf enough to live on. Beginning in 1937, Schnepf rented land in his own name, and, on his own initiative, farmed it for the benefit of the partnership venture. Schnepf

borrowed money from the Western Cotton Products Co. to finance these operations. He signed all leases, notes, and mortgages individually and was personally liable thereon.

W. W. Damron returned to Arizona in the spring and fall of 1937 and remained some time on each occasion. While here in the spring, an additional 30 acres was purchased by Damron under the arrangement, to help carry the project as the 80 acres was insufficient. He also looked at and tried to buy an 80-acre tract to supplement the operation, but this place was not purchased until 1938.

Throughout operations, the farms account would run short of money. Schnepf would borrow money on his personal note and deposit this to the partnership account, and the notes would be paid out of income from the partnership ranches or from leased land. In 1939 Schnepf leased around 240 acres and farmed this, with the profits going for his living and for partnership purposes.

The evidence discloses that Damron forwarded something in excess of $14,000 for farming operations in addition to the purchase price of the land. With this money appellees lived for five years, acquired sufficient machinery to farm 230 acres of land, entirely remodeled the home, and brought to an excellen state of growth and development the 40 acres of citrus. Schnepf drew varying amounts as support money averaging from $120 to $125 per month or a total of $8,191.78 over the five-year period.

In 1941 Schnepf desired to secure additional finances. He applied to the Western Cotton Products Co. for a loan up to $22 per acre. Solely for the purpose of allowing an advance up to that amount, the gin clerk (who appeared as a witness) prepared a lease form running from Damron to Schnepf covering the entire acreage except the 40 acres of citrus, and Schnepf affixed Damron's name as lessor, his own as lessee,

and Damron's name as landlord to the crop waiver. A check for $1,710 was issued payable to Schnepf and Damron; Schnepf endorsed his and Damron's name, and deposited it to the partnership account. The record also discloses that at the time the W. W. Damron Farms account was opened, a check was issued by deceasd on a bank in Kentucky, made payable to "Jack Schnepf, Foreman." This check was endorsed "Jack Schnepf, Foreman." During the year 1936, Schnepf drew many checks payable to himself with the notation on the check stub that the check was drawn in payment of his salary as foreman.

Through the five years from 1936 to the evening before his death, Damron expressed satisfaction with his agreement and venture and with Schnepf's performance. The night before his accidental death, Damron, on a trip with his brother, Frank L. Damron, told his brother, who had been associated with him for a number of years in the oil business, that he, W. W. Damron, wanted to go to Arizona as soon as they finished drilling "this well"; that "Jack (Schnepf) has a good farm, he sent me some fruit. He has a nice grove out there now, and I am going out there and give him his half of the property."

That Damron and Schnepf should become partners in the acquisition and operation of farms and engage in farming operations in the vicinity of Mesa was testified to by sixteen witnesses, including Elizabeth Damron (mother of deceased), his brother Frank L. Damron, his uncle George Damron, and his sisters Lucy Chesley and Maude Schnepf. Jack Schnepf, Lucy Chesley and Frank L. Damron all testified that a part of the oral agreement was that Damron would purchase such lands as were necessary to carry on successful farming operations and finance the costs until the lands to be acquired, including the citrus property, were placed an a self-sustaining basis.

Some eight witnesses stated that the oral contract provided that Damron would convey to the appellees a one-half interest in the properties acquired by Damron and Schnepf under the partnership agreement and developed by Schnepf. Among these witnesses were the brother, uncle, and two sisters.

The crux of this case is the nature of the parol agreement under which Schnepf took possession of the land. With reference to the inception of the contract, Jack Schnepf testified as follows:

"A. At that time Mr. Damron asked me if I would be interested in farming. Naturally, I told him yes, that was my, that was what I like to do best, to farm. So he wanted to know if he bought some farms would I take these farms over and run them. I told Mr. Damron at this time, I said, 'Bill, what do you mean? Do you mean that I go out and take a job on these farms as a farm hand?' I said, 'If that is what you mean, why, I don't want it. I have a pretty good job and make pretty good money.' And he said, 'No, no, I don't mean that,' he said, 'I know that you have a better job than that, but would you be interested in taking them on a partnership basis?' And I told him I would, that I would be interested, that that was my desire, was to get in the farming business for myself.''

Subsequent to the acquisition of the 40- and 80-acre tracts, Damron and Schnepf had the following conversation, as related by Schnepf:

"A. Well, that was in, after the lands were purchased, that would be in the early part of February some time, probably the first week or ten days of February, and we, Mr. Damron says, 'Jack, let us put this 40 acres into citrus.' I didn't like the idea. I had been listening to the weeping and wailing of citrus growers for quite a while, and I knew their problems quite well. I knew what they were up against. I tried to discourage him all I could, but there wasn't a chance. He told me, he said, 'You put this into citrus, Bill.' I told him 'I am not interested in planting a crop that is going to take everything I can possibly make to

raise it.' I said 'I have got to make some money. I have a large family. I have got to feed them. I have got to make some money.' So then he made me this deal. He said to me, 'Jack, if you will plant this 40 acres in citrus, the whole thing, you can't plant it all this year, nor I don't suppose you will get it all planted next year, but you plant the whole thing into citrus and you grow it and make a good grove out of it, and you develop it,' and he turned to me and said, 'How long does it take citrus to bear?' I said, 'I don't know for sure, but I think it takes five or six years.' He said, 'All right. I will tell you what I will do; at the end of five years I will give you a deed, Jack, to half of the farms in Arizona.'

"Q. Now, after that what did you do, Jack? A. Why, I immediately began to work on the thing."

Lucy Chesley, sister of W. W. Damron and Maude Schnepf, was on friendly terms with all principals involved, including her deceased brother. She testified that toward the last of January or the first of February 1936, while visiting at her mother's home, she heard the following conversation:

"A. Bill had been visiting here from Kentucky, and he had spent most of the day riding around with Jack looking over the farms. He came home, and as he entered the door he was very happy and light hearted, and he said, 'I have made a real good proposition with Jack.' He then went on to tell us what this was all about. He said that he was very much interested in putting the 40 acres where Jack lived into citrus, all into citrus but a few dates, and he told us that Jack had tried to discourage him on the idea because he told him it was a very expensive crop to raise and there wasn't any money in citrus, but Bill told him if he would go ahead that he would, and plant all these trees and take care of it and bring them to maturity *he would take him* in fifty-fifty on the 40 acres and make him a partner with him, and Jack still tried to discourage him from planting citrus. Even then he felt that they would not make any money off of it, but wanted him to plant cotton or something else,

told him that that particular farm, the 80 acres would not even finance this crop of citrus on the 40 acres, and he also, Bill laughed and told about how Jack had made the remark that it was a rich man's play to raise citrus, that there was nothing in it, and Bill laughed and said 'That is what I want, something to play with.' He said, 'I got, I am making plenty of money in Kentucky in my oil wells, and I want somewhere to invest my money and put it where I won't have to pay so much income tax.' And he went on then to say that Jack had, that Jack thought this was a pretty good idea after he had talked to him, but Jack also told him at that time that the eighty would not finance the other, and when he made this remark, he said 'Well, I will buy some more farms if we want some more to finance it and go ahead with it,' and he said 'Jack, you go ahead now and plant all those trees. I want all varieties of citrus and some dates,' and he said, he said, 'Well, I want these farms to be model farms, something that I can come out from Kentucky and look at and be proud of,' and he said, 'You go ahead and do all this and we will go fifty-fifty on the whole deal, on all the farms, and I will put you in as a partner with me.' Now that was the contents of his talk.''

Hugh Hall, a citrus man for thirteen years, and an old acquaintance of W. W. Damron's in Clifton, Arizona, testified for appellees. The witness had not seen Damron for some years until Damron came into his nursery in Mesa in 1936 to buy some citrus trees. Concerning the transaction herein involved, this witness said:

"A. Well, he said, he just volunteered first 'Jack has made good, hasn't he?' and I said 'Yes, he certainly has'; he said 'He surely made that place look wonderful,' and he said 'I don't pay Jack any wages,' he said 'Jack is my partner.' '' . . .

"A. He said he had to buy more land so Jack would have money enough to carry this grove; he could not carry the grove and live and keep up everything with just what land he had and he was going to buy more

land. He told me he had two tracts more land that he was going to buy."

With regard to the actual formation of the parol agreement, Maude Schnepf testified as follows, concerning a conversation at her mother's home between W. W. Damron, Elizabeth Damron, Jack Schnepf, and herself:

"A. Bill asked Jack if he would be interested in farming, and Jack said, 'What do you mean, Bill?' Bill said, 'I have some money I would like to invest in a farm, but I can't run it myself. Would you be interested in running it?' And Jack said, 'Well, not as a farm hand, no. I don't like that kind of work, but I would like to run and operate a farm if it was better than what I have now.' Bill said, 'I will give you a good proposition, Jack. I will buy some farms and I will take you in as a partner because I want to help you. You have a large family, and I think you need a lift, and I want to help you.' "

Frank L. Damron testified that when W. W. Damron returned from Arizona in the spring of 1936, he had the following conversation with him:

"A. Bill said, 'Well, I had a nice trip out West, and I saw Mother and I saw Sisters, and I have gone into the farming business.' "

"A. Well, I said, 'How come you have gone in the farming business?' 'Well,' he said, 'I bought some farms in Arizona.' "

"A. He told me when he got out here he went around with Jack a lot and decided to buy some farms, that Maude and Jack had several children, and he thought Jack was a good worker and needed a chance, so he said, 'I found an eighty and a forty acres out there, I got a good buy on them; it is old run down farms, and we got a good buy on it,' he said, 'I am going to grow forty acres of citrus fruit.' I said, 'It costs a lot of money, don't it, Bill?' He said, 'Yes, but I want forty acres of citrus fruit and' he said, 'I have turned the farms over to Jack, and Jack is my partner'; he

said, 'If Jack makes a good grove, that is in the citrus grove, I am giving him half interest in the farms.' "

With reference to purchasing more land to go in the deal with Schnepf, decedent told Frank Damron shortly after returning from Arizona in 1937:

"A. Bill told me it was costing a lot of money to grow that citrus, forty acres, and he said, 'I don't want to keep spending money out there so I have decided to buy more land and put it in the deal with Jack so he can raise other crops and have enough to take care of the forty acres and bring it into production.' "

Mr. and Mrs. Weir of Kentucky, intimate friends of the W. W. Damron family, were introduced to the Schnepfs at a time when the Schnepfs were visiting W. W. Damron in Kentucky. With reference to this occasion, Mr. Weir testified as follows:

"A. Mr. Damron called me over and introduced me to them and said 'This is my sister and her husband, Mr. and Mrs. Schnepf.' He called them Jack and Maude. He said 'You know about my farms out in Arizona,' and said 'Mr. Schnepf is my partner in developing my farm for me,' and I also made the remark at the time, I said, 'Bill, you do the farm like you do the oil leases. You go and buy an oil lease and get some driller on that lease to develop it and go in partners,' and he said 'That is right. You have got me right,' He said 'Jack is doing a good job of it too.' "

Elizabeth Damron, the mother, testified as follows:

"A. Bill said he was going to turn it over to Jack. He said, 'It will be your responsibility.' He said 'You will be interested in the farms,' and he said, 'You show me that you put those farms in good condition and we will go fifty-fifty.' "

Subsequent to the formation of the agreement, this witness spent several summers in Kentucky visiting her son. She was acquainted with the properties being farmed by appellees and reported their condition to

decedent on each of her visits. On her trip in 1936, W. W. Damron told her:

"A. He said that Jack had done more than he expected him to do. He said, 'The ranches proved themselves,' and he said 'From now on, Jack, from now on, it will be a fifty-fifty business between me and Jack, but he must be the manager.' He says: 'If he has any headaches, keep them in Arizona, for I have plenty of trouble here of my own.' "

George Damron, uncle of the deceased, related a conversation he had with the deceased with reference to the farm and the arrangements with Jack.

"A. . . . And he said, no he wasn't running it, that Jack was his partner on it, and if he made good he was going to give Maude and Jack a half-interest in the farm."

This case was tried with the aid and assistance of a jury. Nine interrogatories were propounded and answered. By its answers the jury determined that:

1. Damron did agree to convey to Schnepf a one-half interest in real estate thereafter acquired by Damron and farmed by Schnepf in consideration of the agreement of Schnepf to plant 40 acres to citrus and develop and improve the other farm land.

2. That the city lots were not included in the agreement.

3. That Schnepf quit his then employment in consideration of the agreement.

4. That Schnepf devoted all of his time and efforts to the development of the agricultural lands for a period of five years.

5. That the agricultural lands involved were developed by virtue of the special efforts, experience, and ability of Schnepf.

6. That a portion of the agreement was that the Schnepfs would draw for their personal use from the finances furnished by Damron and the income of said

farming properties only sufficient monies to purchase the necessaries of life.

7. That the Schnepfs did not draw a sum of money in excess of the amount required to purchase the necessaries of life.

8 & 9. That Schnepf and wife expended the sum of $1,725 of their separate money, not derived from the income of the Damron agricultural properties and not derived from amounts remitted by Damron for farming expenses.

The motion of the Schnepfs for judgment upon the interrogatories was granted. The trial court in its written judgment specifically adopted and accepted as its findings of fact the interrogatories and answers thereto. The court made additional findings of fact to the effect that all material allegations of the amended answer and amended cross-complaint were true except the allegation concerning the city property. The court specifically found that the city property belonged to deceased, and that the administrator was entitled to have the title thereto quieted in him.

Appellant has made eleven assignments of error. His first assignment of error asserts that the court erred in admitting testimony to contradict the terms of the lease above referred to as having been made to the Western Cotton Products Co. It is the contention of the appellant that the lease constituted an agreement binding upon the appellees, and the appellees were estopped to deny the binding effect of the lease and to assert any interest in the land included therein.

The second and third assignments of error go to the proposition that the trial court abused its discretion in permitting the appellees to testify concerning the transactions with deceased for the reason that such testimony is incompetent under provisions of Section 23–105, Arizona Code Annotated 1939.

The fourth assignment of error challenges the sufficiency of the evidence to establish the parol agreement, charging that the proofs showed that the wife of W. W. Damron did not acquiesce in the agreement; that the appellees had not fully performed; that they could be fully compensated in money damages for personal services; that the equitable remedy of specific performance is not available to them; and that the answers to the interrogatories returned by the jury are insufficient to warrant the judgment of the court.

Appellant's fifth, sixth, and seventh assignments of error complain of the refusal of the trial court to give additional interrogatories requested by plaintiff below. Appellant's first refused interrogatory requested the jury to determine from the evidence if the alleged contract required Schnepf to devote his entire time and efforts to the development of the property. The second refused interrogatory asked the jury to determine whether or not Schnepf had abandoned the contract. The third refused interrogatory requested the jury to determine whether or not the lands purchased by Damron were unproductive lands at the time of their purchase. The fourth refused interrogatory asked the jury to determine whether or not the 40 acres of citrus were planted, nurtured, and grown to be an especially productive grove.

Appellant's ninth, tenth, and eleventh assignments of error allege error in denying his motions to dismiss the cross-complaint made at the conclusion of cross-complainant's case; in denying appellant's motion for judgment notwithstanding the interrogatories; and that the answers to the interrogatories were not supported by competent evidence.

In support of these assignments, appellant submits five propositions of law:

1. That the evidence in this case is insufficient to take the alleged contract out of the statute of frauds.

2. That the lease referred to in the foregoing statement of facts constituted an agreement binding upon appellees and appellees are estopped to deny the legal effect thereof.

3. That the court erred in permitting the appellees to testify as to transactions with deceased under the circumstances of this case, and that such action constituted an abuse of discretion on the part of the trial court.

4. That the alleged contract is void by reason of the fact that the wife of Damron did not join in nor acquiesce to the contract.

5. That the findings of the jury by their answers to the interrogatories submitted to them are not sufficient to constitute the basis for the judgment rendered.

██ In reply to appellant's first proposition of law to the effect that the evidence in this case is insufficient to take the alleged contract out of the statute of frauds, appellees point out that the assignments of error are not supported by this proposition of law. They contend that appellant in formulating this proposition of law has attempted to inject into this appeal the statute of frauds, a matter which was not stated as an affirmative defense nor brought upon the trial of this cause in the lower court. It is provided in Section 21–406, Arizona Code Annotated 1939, that:

"In pleading to a preceding pleading, a party shall set forth affirmatively . . . statute of frauds . . . and any other matter constituting an avoidance or affirmative defense. . . ."

In no pleading did the appellant set up the statute of frauds as an affirmative defense. At no time during the trial of this case did the appellant assert or attempt to assert a defense based upon the statute of frauds. No objection based on the statute of frauds was made by the appellant to the introduction by appellees of evidence of the contract alleged in their

amended cross-complaint. It is the position of the appellees that in failing to plead the statute of frauds and by failing to object to the proof of the oral contract on the basis of the statute of frauds, the appellant has waived the benefit of the statute and cannot now claim it. Citing the case of *Alley* v. *Peeso,* 88 Mont. 1, 290 Pac. 238; *Segal* v. *Allied Mutuals Liability Insurance Co.,* 285 Mass. 106, 188 N. E. 504; *Thomas* v. *Pope,* 380 Ill. 206, 43 N. E. (2d) 1004.

In response to this position, appellant points out that appellees pleaded a case without the statute in that they alleged that they had altered their position, that they had completely performed, and thus brought themselves within an exception to the statute of frauds. In this behalf, appellant directs our attention to *Murphy* v. *Smith,* 26 Ariz. 394, 226 Pac. 206; *Sullivan* v. *Townsend,* 30 Ariz. 63, 243 Pac. 913; *Waddell* v. *White,* 51 Ariz. 526, 73 Pac. (2d) 490. These cases hold that the statute of frauds has no application where there has been a complete performance of the contract.

The plaintiff below filed a supplemental motion for judgment notwithstanding the interrogatories returned by the jury, one of the grounds for this motion being:

"That the evidence introduced in said cause is insufficient to entitle the defendant and cross-complainant to the judgment prayed for, or for any judgment, because, as a matter of law, such evidence does not constitute a voidance of the Statute of Frauds as provided by the laws of the State of Arizona relative thereto."

It is our considered opinion that the appellees laid their case in the trial court on an exception to the statute. The alleged agreement did not contravene the statute and if the proof followed the pleading it would have disclosed a contract valid so far as the statute of frauds was concerned. *Williamsburg City*

*Fire Insurance Co.* v. *Lichtenstein,* 181 App. Div. 681, 169 N. Y. S. 146; 27 C. J. 371; 37 C. J. S., Frauds, Statute of, § 265. Not until the cross-complainants below had completed the presentation of their case was it possible for the cross-defendant below to make an appraisal of the evidence to determine therefrom whether or not cross-complainants had offered evidence clearly substantiating the allegations of their cross-complaint which were within an exception to the statute of frauds. Cross-defendant seasonably raised the statute of frauds in his supplemental motion for judgment notwithstanding the interrogatories returned by the jury, and we hold that he is entitled to raise the defense of the statute of frauds in this court.

Our statute of frauds requires that contracts of the nature herein involved be in writing or specific performance will be denied, but the law, in order to prevent the statute from becoming an instrument of frauds, has engrafted an exception so as to permit specific performance to be decreed where there is no other adequate remedy at law. 49 Am. Jur., Spec. Perf., Section 21.

This court, in the case of *Costello* v. *Cunningham,* 16 Ariz. 447, 147 Pac. 701, 710, in an action to enforce a trust upon mines to which the title was in the name of another, said:

"The burden was upon plaintiffs to establish, by clear and convincing evidence, ownership of the said mines in Patrick Cunningham substantially as alleged in their complaint. They concede that the record title to the mines in question was held by Martin Costello. The presumption of law is indulged in such case that the holder of the record paper title is the owner of the whole estate, and unless such presumption is overcome by proof, it must prevail."

Again at page 477 of the Arizona Report, this court said:

"A common requirement is that the evidence be clear, explicit, and convincing, not only as to the existence of the trust, but as to its terms and conditions. 39 Cyc. 84.

"The rule requiring the evidence to be clear and satisfactory is especially applicable where the trust is attempted to be proved by parol evidence, as well as when it is sought to convert into a trustee a person holding the title to property ostensibly as absolute owner. 39 Cyc. 84, 85."

██ We are not unmindful that where such a contract as this is sought to be enforced after the death of the other party to it, it should be scrutinized with particular care. No such contract can be established without a satisfactory showing that it is definite and certain and just. Such a contract can be established only by clear and convincing testimony within the rules set forth by this court in the case of Costello v. Cunningham, *supra.* This question has been often discussed and the courts variously agree on the quantum of proof required. A number of these cases are collected in 101 A. L. R. 998; 58 C. J. 1195, § 553. In *Kane* v. *Hudson,* 273 Ill. 350, 112 N. E. 683, 684, the court said:

"If an oral contract to convey land has been made, and there has been such performance in reliance upon the contract as will take it out of the statute of frauds, it will be enforced by a court of equity. Such a contract must be clear and definite and unequivocal in its terms, and it must be clearly and satisfactorily proved. It is indispensable that the acts done in performance of the contract shall be referable to the contract alone, and to have been done in performance of it. It is not necessary that the contract shall be proved by the testimony of any witness who heard it made, and it may be proved by declarations of the parties not in the presence of each other, together with evidence of acts and conduct of the parties which shows that the agreement was made, but it cannot be proved by declarations or acts of only one party to the al-

leged .contract not binding upon the other.'' Citing cases.

In *Minion* v. *Adams*, 181 Iowa 267, 164 N. W. 593, 597, the court said:

'' . . . In proving a contract of this kind, if it is to be ever established in any case, it is made up very often in large part by statements of the parties to different persons, and made up of fragments put together as a whole. In making such statements, the party making them would not be likely to use the same language to every person, nor use the same degree of accuracy he would in drawing a legal document.''

There seems little conflict in the authorities that where, upon the whole case, the Chancellor's mind is satisfied that an agreement was made and performed by the claimant, specific performance follows as a matter of course.

With these rules of law in mind and desiring to adhere to them and the holdings in the cases above set forth, we have had the onerous task of examining 766 pages of the transcript of testimony, digesting 300 pages of briefs, and examining the countless cases cited in our endeavor to determine whether or not the counter-claimants below sufficiently proved their right to a decree of specific performance by clear and convincing testimony. Not desiring merely to make a bald statement by way of conclusion that the testimony was clear and convincing, we have perhaps been over-zealous in extending into this opinion an excessive statement of the evidence. We conclude that the trial judge was justified in adopting as his findings of fact the answers to the interrogatories as found by the jury.

We will now consider appellant's second proposition of law that the execution of the lease constituted an agreement binding upon appellees, and that they are estopped to deny the legal effect thereof.

The evidence fairly discloses that W. W. Damron had no desire to be bothered with any of the details concerning the farming operations in Arizona. He left the farming operations, including the financing, to the appellee Jack Schnepf. He did not sign the lease. Schnepf signed the lease, designating Damron as the lessor and himself as the lessee. Schnepf stated unequivocally that it was for financial purposes only, the clear inference being that it was not intended as a statement or confession of the legal relationship of landlord and tenant. The finance company knew the purpose of the lease. The fact that appellee Schnepf designated himself as foreman and again as a lessee without explanation leaves the inference in one case that he was an employee and in the other that he was a lessee. Appellant had the advantage of having the judge and jury hear and consider these contradictory actions. Nevertheless, a careful and conscientious trial judge, aided by a jury, heard the explanation of the witness, and both judge and jury were satisfied he was telling the truth, and their determination on that question is conclusive on this court. *Dunseath* v. *Tucson Golf & Country Club,* 51 Ariz. 14, 74 Pac. (2d) 43.

The case cited by appellant, *Rankin* v. *Simpson,* 19 Pa. 471, 57 Am. Dec. 668, is in no manner in point. At the outset we are here concerned with a case which involves a partnership, with one partner, for the use and benefit of both, complying with the request of the finance company. Both received the benefit of the action taken which was in keeping with the common understanding that Schnepf should handle all financing as he saw fit. In the Rankin case, the purpose of the lease was to defraud creditors, and the lease was actually executed by both parties. Here the purpose of the lease was innocent, and it was not executed by the designated lessor. This court in the case of *Brown* v. *First National Bank,* 44 Ariz. 189, 36 Pac. (2d) 174,

approved the rulings of the trial court which admitted parol evidence to prove that the parties to a purported written assignment never intended it to become effective as such.

We will now consider appellant's assignment of error and the proposition of law in support thereof that the court erred in permitting the appellees to testify as to the alleged transactions with the deceased and that such action constituted abuse of discretion. It is the position of appellant that the trial court by its actions abrogated the statutes of Arizona as provided in Section 23–105, Arizona Code Annotated 1939, under the guise of an exercise of the discretion alleged to be thereby vested in the trial court. We quote from appellant's brief:

"Thus property rights of a decedent are made to rest upon the discretionary power vested in a trial court to admit the evidence of a party to a suit against an adversary whose death has sealed his lips."

This court has uniformly left the question as to the admission of such testimony to the discretion of the trial court. *Goldman* v. *Sotelo,* 7 Ariz. 23, 60 Pac. 696; *Costello* v. *Gleeson,* 15 Ariz. 280, 138 Pac. 544; *Johnson* v. *Moilanen,* 23 Ariz. 86, 201 Pac. 634; *Brought* v. *Howard,* 30 Ariz. 522, 249 Pac. 76, 48 A. L. R. 1347; *Steinfeld* v. *Marteny,* 40 Ariz. 116, 10 Pac. (2d) 367; *Wolff* v. *First National Bank,* 47 Ariz. 97, 53 Pac. (2d) 1077; *Phoenix Title & Trust Co.* v. *King,* 58 Ariz. 477, 121 Pac. (2d) 429.

An able and experienced trial judge, who saw the witnesses and followed the case closely, in his discretion felt that the ends of justice would be served by permitting a full disclosure of all the facts. Nothing appears to indicate his ruling was other than eminently just and equitable. We are of the opinion that there is sufficient evidence in the case, disregarding appellees' testimony, to sustain the judgment.

■ We shall dispose of appellant's assignment of error asserting that the alleged contract is void by reason of the fact that the wife of Damron did not join in nor acquiesce to the contract in the following manner. At the outset of the trial the parties formally stipulated that the material issues of plaintiff's complaint were true except insofar as defendants' (appellees') cross-complaint might give them rights therein. Appellant proceeded to trial on that stipulation which embraced his allegation that "Gertrude Hall, sometimes known as Gertrude Damron, is a single woman."

■ Appellant's fifth, sixth, and seventh assignments of error complain of the refusal of the trial court to give additional interrogatories requested by the plaintiff. The number of interrogatories submitted was discretionary with the trial court. In *Stephens* v. *White,* 46 Ariz. 426, 51 Pac. (2d) 921, 926, this court said:

"Whether, in excusing the jury and deciding the matter himself, the court felt that there were no disputed questions of fact, or if there were, that they were of such a nature that he did not need the jury's advice to decide them, does not appear and is wholly immaterial. . . . And if the evidence were in dispute but such that the court felt it did not need the jury's aid in determining the issues, he was not required either to submit the case or follow the jury's verdict in case he did. . . . "

In any event the jury's answers were advisory only; the court was not bound by the jury's answers. *Brady* v. *Brady,* 48 Ariz. 308, 61 Pac. (2d) 390. It is apparent that the trial court submitted such interrogatories as it felt necessary to fully advise the court on what it considered to be the controverted issues of fact, and upon which it desired advice. It was required to do no more.

Our disposition of appellant's first eight assignments of error relieves us of the duty of specifically

treating appellant's ninth, tenth, and eleventh assignments of error charging error in denying his motion to dismiss the cross-complaint, in denying his motion for judgment notwithstanding the interrogatories, and that the answers to the interrogatories were not supported by competent evidence. This case was tried on its facts. It is the type of case that is easy to allege but hard to prove within the rules and decisions of this court. The trial court adhered strictly to the law. Appellees made a case, and in our opinion the judgment of the trial court was eminently fair and just. Accordingly the judgment is affirmed.

STANFORD, C. J., and MORGAN, J., concur.