558 P.2d 927

James E. HOPPER, Petitioner,

v.

INDUSTRIAL COMMISSION of
Arizona, Respondent,

Schuck Components Systems, Inc.,
Respondent Employer,

Home Insurance Company, Respondent
Carrier.

James E. HOPPER, Petitioner,

v.

INDUSTRIAL COMMISSION of
Arizona, Respondent,

Schuck & Sons Construction Co.,
Respondent Employer,

Mission Insurance Company,
Respondent Carrier.

No. 1 CA–IC 1305.

Court of Appeals of Arizona,
Division 1,
Department C.

Sept. 7, 1976.

Rehearing Denied Nov. 16, 1976.

Review Denied Dec. 14, 1976.

Ely & Bettini by Joseph M. Bettini, Stephen L. Weiss, Phoenix, for petitioner.

John H. Budd, Jr., Chief Counsel, The Industrial Commission of Arizona, Phoenix, for respondent.

O'Connor, Cavanagh, Anderson, Westover, Killingsworth & Beshears, P. C. by Lawrence H. Lieberman, Phoenix, for Schuck Components Systems and Home Ins. Co.

Jones, Teilborg, Sanders, Haga & Parks, P. C. by James A. Teilborg, Joseph L. Moore, Phoenix, for Schuck & Sons Const. Co. and Mission Ins. Co.

## OPINION

HAIRE, Chief Judge, Division 1.

On this review of a consolidated award entered by the respondent commission in a workmen's compensation proceeding, the petitioning workman contends that the evidence was insufficient to support the hearing officer's refusal to award him further compensation benefits. The hearing officer's refusal was based upon his findings to the effect that petitioner had been guilty of fraud in initially establishing his compensation claim, and therefore was not entitled to any further benefits.

Petitioner's initial claim (No. 3/3–45–47, filed May 11, 1973) alleged that he injured his right knee while stepping off a forklift while employed by Schuck Component Systems, Inc. This claim was accepted for benefits by the carrier, respondent Home Insurance Company. On October 9, 1973, this claim was closed by the carrier's notice of claim status, discharging petitioner with a scheduled 10% permanent disability of the right leg. Petitioner had by that time returned to work for respondent Schuck and Sons Construction Co., with respondent Mission Insurance Company being the compensation carrier. Sometime during the latter part of 1973, his employment was terminated due to a recession in the construction industry.

Thereafter, on February 21, 1974, petitioner filed a petition to reopen his April 1973 knee injury claim based upon new, additional or previously undiscovered disability. This petition to reopen was denied by the carrier, with the carrier contending that petitioner had sustained a new injury to his knee shortly after going back to work. After the denial of the petition to

reopen, petitioner filed a timely request for hearing, and in order to fully protect himself, also filed a new claim alleging that in October 1973, he had sustained a new injury to his knee arising out of and in the course of his employment with the respondent, Schuck and Sons Construction Company. This new injury claim was denied by respondent Mission Insurance Company, the responsible carrier at the time of the alleged new injury. Petitioner again filed a timely request for hearing, and the Commission's hearing officer then consolidated the two matters, that is, the petition to reopen and the new injury claim for all further proceedings before the Commission. A consolidated hearing on both matters was held on September 10, 1974.

### THE REOPENING CLAIM (ICA Claim No. 3/3–45–47)

Prior to the time of the consolidated hearing, defendant carrier Home Insurance Company gave notice to the petitioner that it would defend its denial of the reopening on the basis that the original claim of April 24, 1973 was fraudulent, that is, that petitioner in fact had injured his right knee as the result of a motorcycle accident shortly before the alleged industrial episode. After hearing the evidence, the hearing officer issued his decision and findings which supported the carrier's contentions concerning the fraudulent nature of the original claim, and for that reason the reopening was denied.

■ On this review petitioner does not dispute the principle that the Commission may refuse to award further compensation benefits when it is shown that the initial claim was fraudulent, even though with the passage of time the carrier's acceptance of the original claim as compensable or the Commission's issuance of a prior award of compensability had become final. See *Scott v. Wasielewski,* 89 Ariz. 29, 357 P.2d 614 (1960); see 3 Larson's Workmen's Compensation Law, § 81.50. Petitioner's sole contention concerning the denial of the reopening claim is that the record is insufficient to establish by clear and convincing evidence that the petitioner filed a fraudulent claim.

■ It is beyond question in this jurisdiction that a claim of fraud must be established by clear and convincing evidence. *Brown v. Karas,* 73 Ariz. 62, 237 P.2d 799 (1951); Udall, Arizona Law of Evidence, § 5, page 16. The purpose of the "clear and convincing" standard is to guide the trier of fact in the consideration of the evidence. It is not a test to be applied by an appellate court in passing on the sufficiency of the evidence. *Beeler v. American Trust Co.,* 24 Cal.2d 1, 147 P.2d 583 (1944). Therefore the finding of the trier of fact should be sustained if the evidence furnishes reasonable or substantial support therefor. *Murillo v. Hernandez,* 79 Ariz. 1, 281 P.2d 786 (1955); *Brown v. Karas, supra* ; *King v. Uhlmann,* 103 Ariz. 136, 437 P.2d 928 (1968)[1] Even where the more stringent "beyond a reasonable doubt" standard is imposed as a guide for the trier of fact, questions concerning the credibility of the witnesses and the weight and value to be given to the testimony are considered as questions exclusively for the jury, *State v. Pieck,* 111 Ariz. 318, 529 P.2d 217 (1974), and the appellate court in reviewing the sufficiency of the evidence is only concerned with whether there is substantial evidence in support of the verdict. *State v. Childs,* 113 Ariz. 318, 553 P.2d 1192 filed August 6, 1976.)

■ These same general principles govern appellate review of Industrial Commission awards in workmen's compensation proceedings. *Micucci v. Industrial Commission,* 108 Ariz. 194, 494 P.2d 1324 (1972). Therefore, in reviewing the sufficiency of the evidence to support the hearing officer's findings here, we must resolve all questions of credibility and state all inferences in the light most favorable to sustaining the award. Considered in such light, the question of whether the evidence offered to

---

1. In *King v. Uhlmann, supra,* the court stated that the findings of the trier of fact should not be disturbed " ' " . . . unless we must say as a matter of law that no one could reasonably find the evidence to be clear and convincing." ' " 103 Ariz. at 142, 437 P.2d at 934.

prove fraud is clear and convincing is for the hearing officer to decide. As long as there is reasonable and substantial evidence in support of the result reached by the hearing officer, this Court must affirm that result.

We have previously stated that Home Insurance Company originally denied the petition to reopen because of the contention that petitioner had suffered the new injury to his knee shortly after going back to work. After petitioner filed his request for hearing, Home Insurance Company hired an investigator for the purpose of placing petitioner under surveillance and ascertaining his physical activities over the weekend of May 31, June 1, and June 2, 1974. It was the investigator's testimony concerning his surveillance of petitioner's activities on the afternoon of June 1, which gave rise to the claim of fraud here involved. Concerning such surveillance, the investigator testified that on the afternoon of June 1, 1974, at about 1:45 p. m. petitioner left his residence and went to a bar. After waiting about ten minutes, the investigator also went into the bar. Petitioner was having a drink, and the investigator sat down next to him and ordered a beer. They engaged in conversation and eventually the investigator asked petitioner about his employment. Petitioner told him that he had been unemployed for approximately a year as a result of an industrial accident, that he had fallen from a roof on a construction job and hurt his right knee. This conversation took place at about 2:30 p. m. About 45 minutes later in the course of their conversations, the investigator mentioned that about two years ago he had injured his own knee while riding a motorcycle.[2] Petitioner then told the investigator that approximately a year before he was riding a motorcycle, that he wrecked his motorcycle in the desert, and that's how in fact he hurt his right knee. Petitioner said he was drawing workmen's compensation insurance through the Industrial Commission as a result of the motorcycle accident, and that he had faked an industrial

injury. At the time of this conversation, petitioner had had three drinks and to the investigator did not appear intoxicated.

Petitioner admitted meeting, talking and drinking with the investigator on the afternoon of June 1, 1974, but in effect denied having any conversation with the investigator about a fake industrial claim. However, he does admit that about five weeks before the alleged injury of April 24, 1973, he had a motorcycle accident, up in the mountains on a dirt bike trail on a Sunday. When asked how the accident happened, he testified as follows:

> "Well, I was coming around a bend and I had not been on that trail before and I didn't know it, and my brother-in-law was ahead of me, and I was trying to catch him. He had been through there and knew it and he made the jump fine and I just didn't make the jump. It was a leaning curve and a sand wash, and I just buried it. When I seen I couldn't make it I tried to throw the bike but I didn't make it."

He stated that the motorcycle came down on his right leg, that he went to a hospital for emergency treatment for his right leg; that he missed a week's work as a result of the injury; and that after he went back to work his leg was "a little sore" for a few days, with no trouble at all after that.

In petitioner's brief filed in this Court, counsel states that it should be noted that the petitioner never denied the motorcycle incident, but rather, "volunteered" the history of the event. We must note that insofar as the record shows, this "volunteering" was not so voluntary, and occurred only after the investigator's report had brought the incident to the carrier's attention.

On cross-examination of the treating physician, Dr. Howard P. Aidem, it was brought out that his opinion that petitioner's right knee condition resulted from the alleged industrial injury of April 24, 1973, was based upon the history given to him by the petitioner, and that he could not tell

2. At this point the investigator had no knowledge or suspicion that petitioner had ever been involved in a motorcycle accident. The investi-gator had in fact previously injured his knee in a motorcycle mishap.

from the examination given whether in fact the injury ad occurred "one day prior as opposed to a few weeks prior." The doctor was then asked the following question on cross-examination:

"Q: That is what I am getting at. So to relate his condition on the 25th and all things subsequent to that to the accident on the 24th, you have to do that on the basis of the history that he gave you?
"A: But his history did reveal that he had actually had a previous knee injury from which he thought he had recovered."

Petitioner's counsel cites the above response as indicating that petitioner told the doctor about the motorcycle injury which had occurred five weeks earlier. That this was not the case is clear when reference is made to the doctor's prior testimony given *on direct examination by petitioner's counsel*:

"Q: Would you relate briefly what that history was?
"A: . . .

He said that he had had an injury to his knee *years before* but that it had not bothered him prior to this accident." (Emphasis added)

Obviously this could not be construed as a reference to the motorcycle accident which had occurred within the past five weeks.

At this point it must be emphasized that petitioner knew in advance that the respondent carrier intended to rely upon fraud to defeat the reopening claim. If it was his contention that the knee injury received in the motorcycle incident was trivial, he had ample opportunity to present evidence, and present medical testimony on this point. This he failed to do. Under the facts, it would be logical to conclude, as the hearing officer apparently did, that the petitioner had sustained the admitted motorcycle accident in the desert a few weeks prior to his purported industrial injury, that the injury was of such severity that petitioner was not able to work for a week, that he returned to

work for a few weeks, but found that he was having increasing difficulty with his knee and therefore faked the industrial injury so that he could obtain workmen's compensation benefits.[3]

■■■ Considering the above, we find substantial and reasonable evidence to support the hearing officer's decision. As has been so often stated, the hearing officer is the judge of the credibility of the witnesses, and here he simply chose to believe the investigator's testimony rather than that of the petitioner. We therefore affirm the award denying reopening of petitioner's claim.

## THE NEW INJURY CLAIM (ICA Claim No. N 3/C–89–44)

Having concluded that the hearing officer correctly denied reopening of petitioner's original injury claim, we now turn our attention to questions raised by the hearing officer's denial of compensation on the new injury claim. However, before considering questions raised by the petitioner, we must first consider respondent carrier Mission Insurance Company's claim that this Court lacks jurisdiction to review the hearing officer's denial of the new injury claim.

When the petition for Writ of Certiorari was initially filed in this Court, petitioner did not set forth in the caption Schuck and Sons Construction Company or Mission Insurance Company as parties respondent. Thereafter, petitioner filed a motion to amend the caption to include these respondents. This motion was opposed on the grounds that the time for filing a petition for Writ of Certiorari, pursuant to A.R.S. §§ 23-943 and 23-951, had expired. This Court initially denied the motion to amend the caption, but, after the filing of a motion for rehearing, granted the motion and allowed the amendment of the caption. Respondent Mission Insurance Company has again raised this jurisdictional question in its answering brief. Our reasons for holding that the Court has jurisdiction are as follows.

---

**3.** *In Vino Veritas.* We cannot say as a matter of law that Pliny the Elder was wrong when he stated: "In wine there is truth." Pliny: *Natural History, Book XIV,* Sec. 141.

While the petition was defective insofar as concerns the new injury claim because it did not identify the respondent employer or respondent carrier in either the caption or the body of the petition, it did accurately identify the new injury claim in both the caption and the body of the petition by reference to the Industrial Commission claims file number. There can be no question but that petitioner timely filed his petition for certiorari seeking review of that claim in this Court. A defect in identifying a party against whom an appeal is taken does not necessarily invalidate the appeal, particularly where the judgment being appealed is sufficiently identified and sufficient notice is given so that the putative appellee is neither misled nor prejudiced. *Hanen v. Willis,* 102 Ariz. 6, 423 P.2d 95 (1967). We can see no reason why these same principles should not apply to questions involving the review of workmen's compensation proceedings in this Court. Here the only adverse parties to the law injury claim were the above-named respondent employer and respondent carrier. This Court's Writ of Certiorari to the respondent commission issued on January 21, 1975, and, on that same date, petitioner gave notice of the proceedings to counsel for both of these respondents by mailing to him a copy of the petition and all other pertinent papers.

We find that the respondents on the new injury claim received adequate notice and were neither misled nor prejudiced by the defect in the petition for Writ of Certiorari. We therefore affirm our prior ruling relating to this Court's jurisdiction.

We consider now the merits of petitioner's new injury claim, which was denied by the hearing officer's decision. Petitioner contends that even if it is assumed that the first injury claim was fraudulent, this does not justify the hearing officer's denial of the new injury claim, to use counsel's words, ". . . on the basis, apparently, that if fraud were shown in one claim, it would forever establish the petitioner as a liar." However, we need not go that far in order to affirm the hearing officer's deci-sion. As to this claimed new injury, we need only look to the testimony of Dr. Aidem, petitioner's doctor, and the only doctor to testify. Both on direct examination and on cross-examination, Dr. Aidem testified that the cause of petitioner's complaints was the alleged first injury of April 24, 1973. The testimony was so clear that counsel for respondent Mission Insurance Company did not find it necessary to even examine Dr. Aidem after his two adversaries had concluded. Simply stated, petitioner completely failed to present a prima facie case relating any aspect of his physical condition to the new injury incident which allegedly occurred in October, 1973. Therefore, the hearing officer's decision denying benefits for that new injury claim must be affirmed on the merits.

The award as to both claims is affirmed.

EUBANK, P. J., concurring.

NELSON, Judge, dissenting.

Because of my view that the fraud alleged in this case has not been proven by "clear and convincing evidence", I must dissent. Since the resolution of this issue involves factual questions, additional matters in the record must be set forth. Hopper's initial injury occurred on April 24, 1973. He was seen on the same day by T. Sie, M.D. He was referred by Dr. Sie to Howard Aidem, M.D., an orthopedic surgeon, who saw Hopper the next day, April 25, 1973. He was admitted to Good Samaritan Hospital on May 16, 1973 for surgery, a right medial meniscectomy, which was performed on May 18, 1973. Hopper remained on total temporary disability compensation until August 27, 1973, when he returned to work. On October 1, 1973 he was released by Dr. Aidem with a 10% partial loss of the left leg. On October 9, 1973, Home issued a notice of claim status awarding compensation based upon a 10% functional loss of use of the right leg. See: A.R.S. § 23–1044B (15) and (21).

On February 21, 1974, Hopper filed a petition to reopen, following a letter from Dr. Aidem to the Commission suggesting continuing complaints, possible new X-rays

and additional surgery. The petition to reopen was denied by Home because of an alleged new injury in October 1973 (Claim No. 3/C–89–44, supra). Although Dr. Aidem's communications to the Industrial Commission of Arizona, as did his testimony, supra, all indicated that Hopper's troubles related to his original injury of April 1973, and Hopper himself was reluctant to file a new claim when he did not think he had any basis for it, a new claim was filed as urged by this Court in *Young v. Industrial Commission*, 19 Ariz.App. 304, 506 P.2d 1089 (1973).

Fraud is never presumed and must be proven by "clear and convincing" evidence. *Gardner v. Royal Development Company*, 11 Ariz.App. 447, 465 P.2d 386 (1970). The evidence in this case is not "clear and convincing" within the standards set down for such evidence and the award should therefore be set aside.

First of all, I agree with the majority that this issue is primarily one for the trier of fact, here the hearing officer, and should not be disturbed unless we must say as a matter of law that no one could find the evidence to be clear and convincing. *Murillo v. Hernandez*, 79 Ariz. 1, 281 P.2d 786 (1955). See also: *Micucci v. Industrial Commission*, supra; *Malinski v. Industrial Commission*, 103 Ariz. 213, 439 P.2d 485 (1968); *Gronowski v. Industrial Commission*, 81 Ariz. 363, 306 P.2d 285 (1957).

Before I review the evidence itself, I deem it advisable to review the Arizona decisions touching on this quantum of proof, "clear and convincing evidence". Two early cases referred to and followed in *Murillo v. Hernandez*, supra, discuss the matter in the context of what it takes to achieve this burden in equity cases, specifically constructive trusts imposed by virtue of oral contracts to convey land. *Costello v. Cunningham*, 16 Ariz. 447, 147 P. 701 (1915); *Stewart v. Schnepf*, 62 Ariz. 440, 158 P.2d 529 (1945). While the factual and legal situations are different, the burden of proof is the same as we are here concerned with.

In those two cases these words are used as descriptive of the burden of proof: "clear, explicit, satisfactory, convincing (*Costello*), definite, unequivocal, scrutinized with particular care, certain (*Stewart*)." In *Murillo v. Hernandez*, supra, the Arizona Supreme Court recognized that judges and text writers had "experienced difficulty in precisely defining this quantum of proof". 79 Ariz. at 9, 281 P.2d at 791.

Although the comments are again made in the context of an oral trust in connection with land, the Court's language in *Murillo*, supra, is instructive:

"While the courts generally agree in requiring an extraordinary degree of proof to establish a parol or implied trust, it is difficult to say in what terms the required degree of proof should be stated.

\*      \*      \*      \*      \*      \*

"The rule has been said, however, not to require mathematical certainty, nor does it require direct evidence or uncontradicted proof. It is sufficient, if the evidence is strong enough clearly to convince the court [trier of fact, i.e., trial court, jury, hearing officer] . . ." 79 Ariz. at 9, 281 P.2d at 791.

In *Murillo*, supra, the Court adopted the earlier procedure outlined in *Costello* and *Stewart*, supra, of setting forth extensively the evidence necessarily relied upon by the trier of fact in resolving the issue required to be proven by clear and convincing proof. When that is done in this case, it is my view that the hearing officer either did not apply the proper burden of proof to the carrier, or simply did not appreciate its magnitude as set forth above.

With the exception of one or two questions asked of Dr. Aidem, which will be referred to later, the totality of the proof that Hopper faked his injury is contained in the testimony of Michael Clark, a private investigator employed by Home Insurance Company.

His testimony, except for colloquies between counsel and the hearing officer and questioning to which objections were sustained, is set forth in its entirety:

"Q. Would you state your name for the record, please?

A. Michael Clark.

Q. What is your office address?

A. 3249 East Indian School Road, Phoenix, Arizona.

Q. By whom are you employed?

A. Tatt Investigating Firm, Incorporated.

Q. When did you first become employed with Tatt?

A. Since January.

Q. Of 1974?

A. Of 1974.

Q. Have you worked for them continuously since January?

A. Yes.

Q. What has your work consisted of?

A. A two-month training program and learning the techniques of investigation and then approximately six months in the field.

Q. In six months in the field have you investigated any one particular type of case more than others?

A. Yes.

Q. What type is that?

A. Workmen's Compensation.

Q. Has Tatt Investigating Firm been retained by Home Insurance Company to conduct an investigation into the case involving James Hopper?

A. Yes.

Q. When did you personally first perform any activity with respect to that assignment?

A. May 31st, 1974.

Q. Who did you obtain your assignment from?

A. Mr. Ken Cole.

Q. He is employed by Tatt?

A. Yes.

Q. What were your instructions?

A. Place Mr. James Hopper under surveillance over the weekend of June 1st and June 2nd, 1974, and May 31st.

Q. When did you first observe Mr. Hopper?

A. May 31st.

Q. Incidentally, if you have made notes concerning your surveillance and you wish to refer to them, you may do so. You don't have to, of course. On May 31st did you have any conversations with Mr. Hopper?

A. No.

Q. You just observed him?

A. Yes.

Q. For about how long a period of time?

A. I observed him from 4:00 o'clock, I followed him home, myself and another investigator, we followed him home. Later on that evening, approximately 6:20 he left his home, went to a garage, he left the garage, stayed at the garage approximately an hour or so, left the garage, went to a bar located near the corner of—Michele's Bar located near the corner of 43rd Avenue and Van Buren, entered the bar.

I called my office, I returned, Mr. Hopper had gone. I saw him later that evening, approximately 8:00 o'clock he returned to the bar. I entered the bar, placed him under surveillance and for approximately two hours. Approximately an hour and a half.

Q. You had no conversations with him on that day?

A. No.

Q. When did you last see him on May 31st?

A. May 31st?

Q. Yes.

A. 10:00 p.m.

Q. Where was he then?

A. He was leaving Michele's Cocktail Lounge and going home. He was going home.

Q. Did you see him then the next day, which would have been June 1st, 1974?

A. Yes, I did.

Q. When did you first see him on June 1st?

A. About approximately 9:40 a.m.

Q. What did that observation consist of?

A. He simply emerged from his apartment, stood in the front yard momentarily, then returned inside.

Q. When did you see him next on June 1st?

A. About 12:45.

Q. Where were you at the time.

A. I had Mr. Hopper's residence under surveillance.

Q. Where was he when you saw him?

A. He emerged from his residence, walked south on 39th Drive out of view.

Q. When did you next see him?

A. Well, he returned in about five minutes, I saw him again at about 1:40. Yes, it was about 1:40, 1:45 he left his house again and went to Michele's Cocktail Lounge.

Q. Did you then follow him to Michele's Cocktail Lounge?

A. Yes, I did.

Q. Did you go into the lounge after he did?

A. I waited about 10 minutes and then I entered the bar.

Q. When you went to the bar where was Mr. Hopper?

A. He was sitting at the bar.

Q. Where did you seat yourself?

A. To his immediate right.

Q. Right next to him at the bar?

A. Yes.

Q. Had you seen him enter the bar?

A. Yes, I did.

Q. When you got in and sat down next to him, did he already have a drink?

A. Yes, he did.

Q. Did you order a drink?

A. Yes, I did.

Q. Did you engage in any conversation at that time with Mr. Hopper?

A. Yes, I did.

Q. Would you tell us generally to the best of your recollection what your conversation was at that time?

* * * * * *

Q. BY MR. LIEBERMAN: Would you relate to us to the best of your recollection the conversation you had with Mr. Hopper as you sat down next to him at the bar on that day?

A. Well, Mr. Hopper informed me that he had a wife and three children, he had been employed, I asked him about his employment. He said he had been unemployed approximately one year as a result of an industrial accident. Mr. Hopper stated that he was on a roof, he worked for a friend of his in the construction business.

He was on a roof teaching an apprentice how to hang trusses. The gentleman on the other end of the truss gave him too much slack and he fell to the ground and hurt his right knee. He related to me that he went hunting approximately six months prior to this report but upon returning from his hunting trip his doctor informed him not to take part in this kind of activity because the insurance company would think there was nothing wrong with him as far as his claim.

Q. This part about him hurting his knee in the industrial accident, about what time of day did he tell you that?

A. This was about 2:30, approximately 2:30.

Q. Did the subject of his injury come up or his leg injury come up later again in the day?

A. Yes, it did.

Q. About what time did it come up again?

A. Approximately 3:15.

Q. About 45 minutes later?

A. Right.

Q. How did it come up the next time?

A. Well, we were casually talking and I told Mr. Hopper that I had injured my

Q. knee while riding a motorcycle. And he told me that in fact that was how he really hurt his knee, on a motorcycle.

Q. Now this is important. First of all, when you made that statement was that statement true about your own knee?

A. Yes, it was.

Q. When you made that statement to Mr. Hopper did you have any knowledge as to whether or not he had ever had a motorcycle accident?

A. No.

Q. Why did you make that statement to him?

A. Casual conversation.

Q. You told him that you hurt your knee in a motorcycle accident?

A. Yes, I did.

Q. Did you say when?

A. I said about two years ago.

Q. Did you say where the accident happened?

A. I said I was riding a motorcycle in the desert.

Q. To the best of your recollection, what was his response?

A. He told me that in fact approximately a year prior to my report that he was riding a motorcycle and he wrecked his motorcycle in the desert and that's how in fact he hurt his right knee.

Q. What did you say then?

A. I asked him if he had insurance, and he said no.

Q. Was there any more discussion along those lines? Just relate to us the rest of it.

A. Well, he said that he was drawing Workmen's Compensation—or he was drawing insurance through an industrial claim as a result of the motorcycle accident, and then I asked him, I said, you mean you faked the fall off the roof?

And he said yes, I did.

Q. Was there any more discussion about that?

A. Well, he told me that he had planned on getting $50,000 as a result of the accident through the insurance company.

Q. Did you have any more conversations with him for the rest of the day concerning his injury, accident, anything of that nature?

A. No.

Q. When did you last see him on that day?

A. 7:00 o'clock.

Q. That night?

A. Yes.

Q. When you had the conversation that you just related to us about Mr. Hopper telling you about the motorcycle incident in the desert, can you estimate for us how much Mr. Hopper had had to drink by then since you joined him at 2:00?

A. Could you repeat the question?

Q. Yes. Can you give us an estimate if you are able as to how much Mr. Hopper had had to drink that day at the time that he related this story to you about him hurting his leg in the motorcycle accident in the desert?

A. In my presence, three drinks.

Q. Did he appear intoxicated?

A. No.

Q. Have you seen him since that day before today?

A. No.

MR. LIEBERMAN: I have no further questions."

EXAMINATION

BY MR. CROSSMAN:

Q. You wrote a report. I wonder if I could see it, please?

A. Sure.

 *    *    *    *    *    *

Q. BY MR. CROSSMAN: Let me ask you this question, if I may. Mr. Clark, when did you dictate this report?

A. When did I dictate that report? Tuesday the following week.

Q. That would be two days later?

A. Yes.

Q. And you dictated from the best of your recollection, is that what it was?

A. I kept notes.

Q. You mean as you were talking to him you kept notes?

A. No.

Q. When did you keep the notes?

A. Immediately after.

Q. You mean you went right home and took notes down?

A. Yes. No, I didn't even go home in fact. I drove down the street several miles.

Q. That's when you wrote the note?

A. Yeah.

Q. How old are you, Mr. Clark?

A. 23.

Q. How long have you been doing this work?

A. Since January, '74.

Q. So you had been doing this what, six months, a little less, five months at the time, is that correct?

A. Five at the time, yes.

Q. And you started putting him under surveillance earlier the day of the 1st, is that correct?

A. Yes.

Q. What time?

A. 6:00 o'clock. 6:00 a.m.

Q. Where did he go at 6:00 a.m.?

A. He didn't go anywhere at 6:00 a.m.

Q. Where is the first place he went?

A. First place he went? Could you be more specific?

Q. Yes, first leaving his home?

A. When he left his home the first place he went? Michele's Cocktail Lounge.

Q. Do you remember the whole report by heart?

A. I reviewed it.

Q. Did you review it just recently, just before you came in?

A. Yes, as a matter of fact.

Q. He went to Michele's Cocktail Lounge. How long did he stay there?

A. Until about 5:30.

Q. What time did he get there?

A. About 2:00. Or about 1:58 p.m.

Q. You were writing these down on pieces of paper, is that correct?

A. Yes.

Q. You knew what time it was?

A. Tell me about the story about how he was involved, the story he told you about the industrial injury. Something about he fell off a roof?

A. Yes, he stated he fell off a roof.

Q. Did he tell you where it was?

A. No, on a construction site.

Q. Did he tell you where the construction site was?

A. No.

Q. Did he tell you that was a phony falling off the roof?

A. Later in the day he did.

Q. When you say later in the day, when was this?

A. Approximately 45 minutes later.

Q. Can you tell us specifically what he told you about this falling off the roof incident? Did he tell you when it happened?

MR. LIEBERMAN: At which time, later or the first time?

Q. BY MR. CROSSMAN: Any time?

A. Any time?

Q. Yes, what did he tell you about this falling off the roof incident?

A. He said he was hanging trusses, he was teaching an apprentice how to hang trusses on a roof.

Q. Did he tell you where it happened?

A. No.

Q. Did he tell you when it happened?

A. The time of day, you mean?

Q. Time of year?

A. Approximately one year prior to my report.

Q. Okay, that would have been June of 1973, right?

A. Approximately.

Q. Did he tell you who he was working for at that time?

A. He didn't give a name.

Q. But he was doing construction work, is that correct?

A. Yes.

Q. What else did he tell you?

A. What specifics?

Q. As to the motorcycle?

A. The motorcycle?

Q. Yes.

A. Told me that he had a motorcycle wreck.

Q. Did he tell you when that was?

A. Approximately one year prior to my report.

Q. That would be the same time that the falling off the roof happened, is that correct?

A. Approximately.

   *    *    *    *    *    *

Q. BY MR. CROSSMAN: Was it your understanding he meant June of '73?

A. Yes.

Q. Did he tell you how this motorcycle accident happened?

A. Told me he was riding a motorcycle in the desert.

Q. Did he tell you where?

A. Buckeye.

Q. Did he tell you what happened?

A. He said he wrecked it.

Q. Did he say he went to the hospital?

A. No.

   *    *    *    *    *    *

Q. BY MR. CROSSMAN: When he told you about this falling off of the roof, did he tell you he went to the hospital?

A. No.

Q. Did he tell you who his doctor was?

A. No.

Q. Did he tell you that this falling off the roof was a phony accident?

A. Could you be more specific?

Q. Yes. What did he tell you, did he tell you he hurt his knee in the motorcycle accident or he hurt it falling down, what did he tell you? I want to remember your precise statements, what he said about hurting his knee.

A. The conversation started, he told me he hurt his knee when he fell off a roof.

Q. Now later in the day he told you he hurt his knee?

A. Riding a motorcycle.

Q. Did he tell you that was in addition to hurting the knee after falling off the roof?

A. No.

Q. What did he tell you about this claim being phony, can you tell me what his exact words were, if you remember?

A. He didn't state verbatim that the claim was phony.

Q. What did he state?

A. He stated—he told me that he faked a fall off the roof.

Q. He faked a fall off the roof. You are sure he said he faked the fall off the roof?

A. I asked him.

Q. You asked him what?

A. You mean you faked the fall off the roof.

Q. What did he say?

A. Yes.

Q. What happened in the conversation after that?

A. Casual conversation.

Q. What was it about?

A. A lot of different things, girls, school.

Q. Go ahead and tell me. What school?

A. What school? My school. I told him I was going to NAU.

Q. Is that part of your cover-up?

A. Can you—

Q. Was that part of your cover-up that you went to NAU?

MR. LIEBERMAN: Cover-up. I object. Undercover?

Q. BY MR. CROSSMAN: Undercover?

A. Yes.

Q. Did you investigate this falling off the roof?

A. What specifics do you want?

Q. As to when it happened, where it happened, why it happened?

MR. LIEBERMAN: Excuse me, I don't think he understands. You mean after that date did he conduct any investigation?

Q. BY MR. CROSSMAN: That's right, after that date did you conduct an investigation to find out about this roof incident?

A. No.

Q. How do you get paid, Mr. Clark?

A. By the hour.

Q. By Tatt Investigation?

A. Yes.

Q. How do they get their cases?

A. How do they get their cases?

MR. LIEBERMAN: If you know.

A. That's handled by Ken Cole.

Q. BY MR. CROSSMAN: Do you know whether attorneys call up and request investigations? Do you know how it's done?

A. Usually insurance companies do.

Q. Do you know how this was initiated?

A. Not with specifics, no.

Q. Do you have any instructions, were you given any instructions by your supervisor or anybody else what to do on this job?

A. Yes.

Q. What were those instructions?

A. Place Mr. Hopper under surveillance.

Q. What was your purpose?

A. To ascertain his activities.

Q. To see what he physically could do?

A. See what he could physically do.

Q. How about to talk to him?

A. Yes.

Q. What were you to learn from talking with him?

A. His physical activities.

Q. What he is physically able to do?

MR. LIEBERMAN: I don't think it's fair. Are you asking him if anyone specifically instructed him this?

MR. CROSSMAN: Exactly what his instructions were.

A. Place Mr. Hopper under surveillance, ascertain his physical activities.

Q. BY MR. CROSSMAN: And when you heard him say that this was a phony claim, is that when you left?

A. No.

Q. How long after he told you this did you leave?

A. Till 5:00—well, I was with him until 7:00, 7:00 p. m.

Q. You did not leave until 7:00?

A. Right.

Q. And you were with him since 1:48, is that right?

A. 2:01.

*    *    *    *    *    *

Q. BY MR. CROSSMAN: How many beers did he have to your knowledge from 2:01 to 7:00 o'clock?

A. He didn't have one beer.

Q. Did he have any drinks?

A. Yes.

Q. How many drinks did he have?

A. Would you repeat the question?

Q. From 2:01 until 7:00 p. m. when you left him, to your knowledge how many drinks did he have?

A. From 2:01 until 7:00?

Q. Are we going to play games or are you going to answer the question?

MR. LIEBERMAN: I object to Mr. Crossman's statement.

THE HEARING OFFICER: I think you may have confused him. Mr. Lieberman's question was how many drinks he had from the time he went in there until the time he mentioned this fake claim. Now you want to know how many drinks he had the whole day.

MR. CROSSMAN: That's exactly right.

THE HEARING OFFICER: If you know, give him the answer.

A. I would say 10.

Q. BY MR. CROSSMAN: How about yourself?

A. I would say I had five beers, six beers.

Q. That was until what time, until 7:00?

A. Yes.

Q. And after 7:00 you ran back to the office and you dictated your report?

A. No.

Q. What did you do after 7:00?

A. I made notes.

Q. You ran a couple of miles away and made notes, is that correct?

A. Yes.

Q. Did he ever tell you how this industrial injury occurred?

A. I'm sorry, I didn't hear you.

Q. Did anybody besides Mr. Hopper ever tell you how this industrial injury occurred?

MR. LIEBERMAN: As of when?

Q. BY MR. CROSSMAN: As of today?

A. As of today?

Q. Yes.

A. I was furnished information from Home Insurance Company.

Q. Before June 1 or after June 1?

A. Before June 1.

Q. And did they tell you how that industrial injury happened?

A. He fell off a forklift.

Q. Didn't you ask him anything about falling off the forklift?

A. No.

Q. You weren't interested in falling off the forklift?

A. No.

*      *      *      *      *      *

Q. BY MR. CROSSMAN: Did you talk to him about whether or not he was ever hurt while falling off a forklift?

A. No.

Q. Did he ever tell you that he had fallen off a forklift?

A. No.

MR. CROSSMAN: I have nothing further.

MR. TEILBORG: Nothing, Mr. Hearing Officer.

MR. LIEBERMAN: Just one. Does your salary in any way depend on the success or lack of success of your investigations?

A. No.

MR. LIEBERMAN: Nothing further.

MR. CROSSMAN: That opens up an area.

THE HEARING OFFICER: You're excused. Thank you very much.

(Witness excused.)

MR. CROSSMAN: I can't ask any more questions?

THE HEARING OFFICER: Next witness, Mr. Lieberman?

MR. LIEBERMAN: I have nothing further.

THE HEARING OFFICER: Mr. Teilborg?

MR. TEILBORG: Nothing further.

MR. CROSSMAN: We have nothing further until Dr. Aidem comes.

THE HEARING OFFICER: He is due at 3:00 o'clock so we will recess."

Neither Clark's notes or his written report were offered into evidence by either party, and are not part of the record in this case.

The only other evidence which even by inference supports the finding of fraud, is a

series of questions and answers to Dr. Aidem:

"Q. To the extent that you relate both his original surgery and his need for surgery now to the accident of April 24th, 1973, do you do that entirely, Doctor, on the basis of the history that you received from the patient as to what happened on that date?

"A. Well, mostly. It's based on the history, the fact that he did have some rotary instability when I first examined him the first time I ever saw him, and the fact is well-known that taking the meniscus itself may be the last stabilizer and if it's torn and removed the instability may increase.

"Q. I am really going back in the other direction. You first examined him on April 25 of 1973 and he described an accident the previous day.

"A. Yes.

"Q. I take it you related his findings on April 25 to the history he gave you of an accident the day prior, is that correct?

"A. Yes, sure.

"Q. And there is really no way you can tell from your examination, is there, that the accident occurred one day prior as opposed to a few weeks prior?

"A. Well, no, not from this exam, no, sir. We would merely trust his history as reliable.

"Q. That is what I am getting at. So to relate his condition on the 25th and all things subsequent to that to the accident on the 24th, you have to do that on the basis of the history that he gave you?

"A. But his history did reveal that he had actually had a previous knee injury from which he thought he had recovered.

"Q. Yes, but still to relate it to what he described on April 25th, you have to accept what he told you happened on April 24th really happened?

"A. Sure, that's exactly right. The determination is based on his history."

The record is devoid of any other evidence of fraud in making the initial claim for workmen's compensation benefits. Hopper never attempted to conceal from his employer or his doctor, or anyone else that he hurt his leg approximately five weeks before the April 24, 1973 incident, in a motorcycle accident in the desert. Were this a routine preponderance of the evidence case, we could perhaps say that it was more probable that Hopper was relating the truth to Clark as opposed to them simply swapping tall tales about work, operations, girls, etc., as they gradually became drunk one summer afternoon in a bar. When the standard of proof is the higher degree of "clear and convincing", the facts of this case and the Arizona decisions cited above, simply do not allow the findings in this case to stand.

The hallmark of the *Murillo, Stewart* and *Costello* decisions, supra, is the requirement of setting forth extensively the myriad of facts and evidentiary support for the issue required to be proven in a "clear and convincing" way. The facts in this case are not even close.

Even in the two portions of testimony set forth above, there are more reasonable inferences of doubt and uncertainty than of clarity and certainty. The relation by Hopper to Clark of his roof top injury is obviously a fabrication. There is no evidence he even worked that kind of construction. All of the evidence is to the contrary. Had it been to their advantage to do so, the employer and carrier could have easily proven, by whatever burden of proof they chose, that that part of the story told in the bar on that warm afternoon of June 1, 1974, was pure fantasy, invented—like war stories and fish stories—to keep the conversation going while the blood alcohol level is raised to its desired height. Very little else in the conversation that afternoon is accurately related to anything that really happened, especially as to time and space, except the fact of a motorcycle accident, which was never denied.

The most glaring omission in the evidence, especially when viewed in relation to the quantum of evidence set out in the *Murillo, Stewart* and *Costello* cases, supra (see also *Scott v. Wasielewski,* 89 Ariz. 29, 357 P.2d 614 (1960)), is the absolute failure,

in spite of opportunity and availability, to present evidence to show that the motorcycle accident in question could possibly—let alone probably or certainly—have been the cause of the conditions Dr. Aidem found on April 25, 1973. While the majority alludes to the fact that Hopper was put on notice that the Carrier intended to rely on the issue of fraud, and therefore should have put on evidence to negate it, there can be no serious contention that the burden of proof shifts because of a mere allegation of fraud, or, for that matter, ever. *Murillo,* supra; *Wasielewski,* supra. There is also no citation to any authority which would shift the burden of going forward with the evidence to Hopper under this set of facts.

In spite of all of the undisputed facts surrounding the motorcycle accident, its disabling effect, the medical treatment received, the days off work required, the full return to the job thereafter for several weeks, no hypothetical question was posed to Dr. Aidem, who had performed the surgery, as to whether it was possible or probable that the motorcycle accident, with all these other facts and time frames properly included, could have been a cause or the sole cause of Hopper's condition, either as of the initial examination of April 25, 1973, or as of the date Dr. Aidem actually performed the surgery and observed the knee internally, or both. No effort whatsoever, insofar as the record reflects, was made to obtain the records, X-rays, if any, or testimony of the treating physician relating to Hopper's motorcycle accident emergency room care. Similarly, neither the testimony or records surrounding Hopper's emergency room care on April 24, 1973 were of record. Obviously Dr. Aidem was not given an opportunity to compare the records, X-rays (if any), and testimony of the emergency room doctors to assist him in determining if it was clear and certain, probable, or even possible that Hopper's condition could have been caused or contributed to by the motorcycle accident.

Since the bulk of my effort has been to show what evidence was not presented which could and should have been presented if probative of the issue sought to be proven by clear and convincing evidence, it is obvious to me that the tests set out in *Murillo, Stewart, Costello* and *Wasielewski,* supra, have not been met. The tall tales of two drinking "buddies" on a warm summer afternoon is insufficient "clear and convincing" evidence to upset a carefully arrived at decision of the Industrial Commission of Arizona, especially where the party with the burden of proving fraud either carelessly or carefully failed to produce the corroborative evidence necessary to sustain this extraordinary burden of proof.

As to Claim No. 3/3–45–47, the award should be set aside.