750 P.2d 852

Sarah RENO, Petitioner Employee,

v.

INDUSTRIAL COMMISSION OF ARIZONA, Respondent,

Siesta Motel and Sands Motel, Respondent Employer,

State Compensation Fund, Respondent Carrier.

No. CV–87–0119–PR.

Supreme Court of Arizona, In Banc.

Feb. 2, 1988.

Rabinovitz & Associates, P.C., Gary M. Israel, Tucson, for petitioner.

Dennis P. Kavanaugh, Chief Counsel, Phoenix, for respondent.

Robert K. Park, Chief Counsel, Phoenix, and W. Smith Michael, Jr., Tucson, for respondent Employer/Carrier.

CAMERON, Justice.

## I. JURISDICTION

Sarah Reno (claimant) seeks review of a memorandum decision of the court of appeals which affirmed an Industrial Commission's (Commission) award finding claimant's request for a hearing untimely. We have jurisdiction pursuant to Ariz. Const. art. 6, § 5(3) and A.R.S. § 23–948.

## II. QUESTIONS PRESENTED

Although the claimant raises three issues in her petition for review, we will consider only the following two issues.

1. Does the evidence reasonably support the administrative law judge's (ALJ) finding that the claimant received the notice of permanent [scheduled] disability benefits?

2. Is the award of a scheduled disability reasonably supported by the evidence?

## III. FACTS

Claimant sustained a fractured wrist during the course of her employment with Siesta Motel and Sands Motel (employer) on 29 January 1983 for which she sought medical attention. A claim was filed for compensation with the State Compensation Fund (Fund) based on the initial medical treatment. After treatment, claimant's condition became stationary, and the Fund issued a notice of claims status terminating temporary benefits and closing the claim with permanent disability. Later, on 29 January 1985, the Fund issued a notice of permanent disability benefits with a scheduled award of an 11 percent functional loss of the left minor arm. Based on this determination, the claimant received monthly

checks in a different amount until June 1985.

The disability check for June 1985 contained a "special notice" calling the claimant's attention to the fact that this would be the last check she would receive. After receiving this notice, claimant contacted the Fund to inquire as to the status of the claim. On 26 July 1985, claimant requested a hearing. Since the request was not filed within 90 days of the 29 January award as required by A.R.S. § 23–947(A), the ALJ limited the hearing to the issue of the Commission's jurisdiction.

After the hearing, the ALJ issued an award finding claimant's request for a hearing untimely. On administrative review, the award was affirmed. The court of appeals affirmed, and we granted review.

## IV. WAS THE NOTICE UNTIMELY?

To obtain review of an award, the injured party must request a hearing within the time specified by A.R.S. § 23–947(A), in the instant case, 90 days after notice of the award. If a party contends that the notice was not received, the party has the burden of showing that fact.

> The industrial commission or any court shall not excuse a late filing unless any of the following apply:
>
> \* \* \* \* \* \*
>
> The person to whom the notice is sent shows by clear and convincing evidence that the notice was not received.

A.R.S. § 23–947(B)(3). This does not mean that "clear and convincing" is the standard on review.

> The purpose of the 'clear and convincing' standard is to guide the trier of fact in the consideration of the evidence. It is not a test to be applied by an appellate court in passing on the sufficiency of the evidence.... Therefore the finding of the trier of fact should be sustained if the evidence furnishes reasonable or substantial support therefor.

*Associated Grocers v. Industrial Comm'n,* 133 Ariz. 421, 423, 652 P.2d 160, 162 (App.1982) (citing *Hopper v. Industri-*

*al Comm'n,* 27 Ariz.App. 732, 734–35, 558 P.2d 927, 929–30 (1976)). Considered in such a light, as long as there is reasonable or substantial evidence in support of the result reached by the ALJ, the appellate courts must affirm the result. *Associated Grocers,* 133 Ariz. at 423, 652 P.2d at 162.

In the instant case, at the hearing before the ALJ, claimant testified to receiving the January check and notice of claims status (terminating temporary benefits), but not the notice of permanent [scheduled] disability benefits. According to the claimant, she first learned of the permanent disability benefits with the notice of last payment in June 1985. As claimant testified:

> BY MR. RABINOVITZ [Attorney for Claimant]
>
> Q. All right. Now one of the items of correspondence I'm—I'm going to borrow the file—thank you—was a notice of claims status dated January 22, 1985, which is here in the Industrial Commission file which indicated temporary compensation and active medical treatment terminated January 14, injury resulted in permanent disability. Did you get that? Do you remember getting that notice of claims status?
>
> A. It said—I got the one that said I was permanently disabled.
>
> Q. Do you recognize this as the one you did receive; that one that says: Injury resulting in permanent disability?
>
> A. Yes.
>
> Q. Now let me show you another notice of claims status—if I can find it—
>
> MR. MICHAEL [Attorney for the Fund]: What are you looking for? I have a copy. Is this it?
>
> MR. RABINOVITZ: Yes. I'm looking for that.
>
> MR. MICHAEL: You can use that.
>
> \* \* \* \* \* \*
>
> (BY MR. RABINOVITZ)
>
> Q. Now, there is another notice of claims status in the Industrial Commission file, the date, with the date of Janu-

ary 29, 1985,[1] which establishes an 11 percent functional loss of the left minor arm. My question to you is: did you receive this notice of claims status prior to—well, at any time in the vicinity of the day of mailing; January 29, 1985?

A. No, I did not.

\* \* \* \* \* \*

Q. Now, when do you—when do you remember receiving a copy of this notice for the first time?

A. When I got my check and it had a card in it telling me that was the last check that I would receive, and that was the—and then, I wrote them and wanted to know what was going on. And they said—she called—the office called me and said they would send me a copy of it, was the first time I had seen it.

At this point in the evidence, we could find that the claimant had not carried her burden of showing that she had not received the notice. At the hearing, however, the Fund's claims representative, Jerry McClory, testified as to the procedure followed in the mailing of notices. He stated that the notice of permanent disability benefits is a multipart form. When issued in the permanent awards section, claimant's copy is attached to the front of her file and held by the payment control section until the first permanent disability check is issued. McClory testified:

BY MR. RABINOVITZ

Q. Jerry, it is not a part of your procedure, is it, to have anything to do with the mailing of notices of claims status that you sign?

A. I do not have any part of it, no.

The Fund's claims manager (Dick Mills) testified:

BY MR. RABINOVITZ

Q. Mr. Mills, you are not speaking from first hand knowledge when you say the procedure was followed; this is something that you have now concluded based on an after the fact investigation, correct?

A. An after the fact investigation was conducted. It is based on the fact that the individual who has been doing it for a number of years was present that day; the individual, Lydia McFilmey, that has been doing it a number of years was present that day. The log, shows—

Q. Excuse me. Could you just answer my question? You didn't have any personal contact with the handling of this file?

A. I did not. I do not personally stuff envelopes with the checks. No.

\* \* \* \* \* \*

BY MR. RABINOVITZ

Q. You are not telling me that every item of mail that has ever gone out from the State Compensation Fund has reached the intended destination?

A. Absolutely not. I'm testifying that the notice of permanent disability benefits and the check for the first permanent benefits that was dated January 29 were placed in the same envelope, went through our system, left our building. I'm not testifying that it was received by anyone, but, those two documents left the State Compensation Fund in the same envelope.

Q. How do you know that?

A. Because that is our absolute policy.

Q. Yes, but outside of it being your absolute policy, can you yourself verify that that's what happened in this case?

A. I cannot personally verify. I did not stuff the checks, and, if I routinely stuff the checks, I doubt that I would have independent knowledge of one specific check that had been done in January, with it now being November.

Following this testimony, the ALJ noted:

THE JUDGE: The record should reflect that during the course of the examination of Mr. Mills, I reviewed the file and the notice of claims status which Mr. Rabinovitz referred to was received at the request of the Commission. Apparently the original notice was never placed in the file, and, on July 2nd, 1985, the Commission—someone in the Commission made a note that Jerry McClory will send a copy of closing of notice of claims

---

1. According to the filing stamp, this notice was not filed with the Commission until 3 July 1985.

status file downstairs, was closed about May, 31, '85.

MR. MICHAEL: That's actually all I was going to ask him.

MR. RABINOVITZ: I'm sorry, your Honor. What was the date of that?

THE JUDGE: July 2nd, and then the notice is received stamped in at the Commission July 3rd.

MR. RABINOVITZ: Thank you.

THE JUDGE: That was a July 2nd memorandum of someone in the Industrial Commission.

In other words, the copy of the 29 January notice was not in the file. Instead the file contained a photocopy of the notice dated 2 July 1985, filed 3 July 1985, and furnished by the Fund's attorney. It would appear that the 29 January 1985 notice never reached the Commission file.

The respondents contend that evidence of business habit and routine by the Fund regarding mailing of notice is sufficient to show that the Notice of Permanent Disability and the disability check were sent out in the same envelope. To establish under the Business Routine Doctrine that the notice was sent, however, no evidence must exist to the contrary.

> It is the general rule in matters of this kind, where it is the custom of a business office to follow a regular routine, that where it is affirmatively established that part of a routine was followed it is presumed, *in the absence of some evidence to the contrary*, that the rest was also followed. (Emphasis added.)

*Consolidated Motors, Inc. v. Skousen*, 56 Ariz. 481, 486, 109 P.2d 41, 43 (1941).

■ In the instant case, there is "evidence to the contrary." The evidence indicates that the notice of claims status never reached the Commission file. If the notice did not reach the Commission file, it can be assumed that the notice never reached the claimant despite the Commission's "absolute policy." We believe, therefore, that the evidence shows that she did not, in fact, receive the notice. The ALJ's finding that the claimant received the notice is not reasonably supported by the evidence.

## V. IS THE AWARD SCHEDULED OR UNSCHEDULED?

Prior to the ALJ's decision to limit the hearing to the question of jurisdiction, a subpoena was issued for the attendance of claimant's treating physician, Dr. Robert Grimes. The subpoena was never cancelled, and Dr. Grimes appeared at the hearing. The ALJ, therefore, over respondent's objection, heard medical testimony concerning claimant's condition. The doctor, on 14 January 1985, filed a report which stated:

> Mrs. Reno was reevaluated at the orthopedic clinic at the Northern Cochise Community Hospital on December 11, 1984. Mrs. Reno continues to complain of pain and limited motion in her left shoulder. She has minimal complaints of pain in her left hand and arm.
>
> On physical examination, she has persistent limitation of motion in the shoulder. Her active flexion is accomplished to 130 degrees, abduction to 100 degrees, internal rotation to 40 degrees and external rotation to 70 degrees. Using the AMA Guide, this results in an eleven percent impairment of the upper extremity as a result of her limited shoulder motion.

Whether the claimant has a disability to the arm or the shoulder is important. If the disability is to the arm, it is scheduled, but if to the shoulder, it is unscheduled. At the hearing, the doctor testified as follows:

BY MR. RABINOVITZ

Q. All right, sir. At the time of your last visit, do you have an opinion, based on a reasonable medical probability, as to whether or not Mrs. Reno had sustained a permanent impairment as a result of her industrial injury of January 29, 1983?

A. Yes.

Q. And what was your opinion?

A. I felt that she did have a permanent impairment. The impairment rating was based entirely on her loss of motion to the shoulder, and using the AMA Guide, I recommended an eleven percent impairment of the upper extremity.

Q. All right, sir. Now, do I understand that the basis for your awarding her an

eleven percent impairment of the upper extremity is primarily because of a limitation of motion in the shoulder itself?

A. Yes.

Q. Does she have impairment in the shoulder itself, in the sense of limitation of motion?

A. Yes.

Q. And is that impairment in the shoulder related to her industrial injury of 1/29/83?

A. Yes.

Q. Do the AMA Guides rate an impairment of the shoulder as far as you are aware?

A. If I remember correctly I believe the AMA Guide rates in limiting the shoulder motion, rates impairment of the upper extremity.

\* \* \* \* \* \*

BY MR. RABINOVITZ

Q. As far as you know, does the AMA Guide rate an impairment to the shoulder itself as opposed to the upper extremity?

A. It does not allow a percentage impairment of the shoulder. It allows a percentage impairment of the extremity.

\* \* \* \* \* \*

BY MR. RABINOVITZ

Q. Can you tell me, by referring to your notes, what percentage of loss of motion she has lost in the shoulder?

A. She has lost approximately thirty percent of abduction and perhaps eight to ten percent of flexion. In terms of the total motion of the shoulder, no, I can't give you a total percentage loss, but, I can give you that percentage of abduction and flexion.

Q. All right, sir. And that is a permanent loss related to this injury?

A. I believe so, yes.

Q. Outside of the limitation of abduction and flexion in the shoulder, does she have any separate impairment in the function of the upper extremity? In other words, is the actual limitation in the shoulder itself, or is there also limitation and function in the arm?

A. Based on the last examination that I made of her, she did not have another impairment of the remaining joint of the extremity.

Despite this evidence, the ALJ found:

The applicant next contends that the NOTICE OF PERMANENT DISABILITY BENEFITS of 11 percent impairment of the left upper extremity is not supported by medical evidence. Dr. Grimes' testimony clearly establishes an impairment of the upper extremity which in common parlance could be interpreted to mean an arm. It is not felt that the NOTICE OF PERMANENT DISABILITY BENEFITS takes any action contrary to Dr. Grimes' testimony.

The court of appeals believed the report of the doctor was ambiguous, but that the "appropriate" interpretation of Dr. Grimes' testimony was that claimant suffered an unscheduled permanent impairment of her shoulder. The court of appeals held, however, that the appropriate remedy was a "timely" request for hearing. Since we have found that the request for hearing was timely, we consider whether the award is reasonably supported by the evidence.

■ Dr. Grimes' medical report makes reference to complaints of pain in claimant's hand and arm, as well as pain in the shoulder. The doctor's medical report could, as the court of appeals noted, be ambiguous. The testimony of Dr. Grimes, however, was not ambiguous. Dr. Grimes testified unequivocally that claimant suffered a disability of not only the arm and upper extremity, but the shoulder as well. The finding that the disability was "scheduled" was not reasonably supported by the evidence. *See Dye v. Industrial Comm'n*, 153 Ariz. 292, 294, 736 P.2d 376, 378 (1987).

## VI. HOLDING

The decision and opinion of the court of appeals is vacated. The award is set aside.

GORDON, C.J., FELDMAN, V.C.J., and HOLOHAN and MOELLER, JJ., concur.