703 P.2d 1206

**MURDOCK-BRYANT CONSTRUCTION, INC., an Arizona corporation; and Sentry Indemnity Company, a foreign corporation, Plaintiffs-Appellees,**

v.

**Taylor PEARSON, dba Taylor Pearson Construction Company; Robert Wilbur individually and jointly; University Industries, individually and jointly; and Insurance Company of North America, a corporation, Defendants-Appellants.**

No. 1 CA-CIV 5630.

Court of Appeals of Arizona, Division 1, Department A.

April 5, 1984.

Jennings, Kepner & Haug by William F. Haug, Phoenix, Tolley, Fisher & Verwys by Peter R. Tolley, Grand Rapids, Mich., Man-

gum, Wall, Stoops & Warden by Daniel J. Stoops, Flagstaff, for Murdock-Bryant Const., Inc. and Sentry Indemnity Co.

Meyer, Vucichevich & Cimala, P.C. by Ronald H. Cimala, Rad L. Vucichevich, Phoenix, for Taylor Pearson dba Taylor Pearson Const. Co. and Ins. Co. of North America.

Black, Robertshaw, Frederick, Copple & Wright, P.C. by Richard A. Black, Phoenix, for Robert Wilbur and University Industries.

## OPINION

EUBANK, Judge.

This appeal arises out of a subcontract for site excavation work on a shopping center construction project located in Flagstaff, Arizona. Following a three month trial to an advisory jury, the court awarded appellee-subcontractor damages in *quantum meruit*, together with attorney's fees. Appellant-contractor appeals from the judgment. We affirm the judgment as to appellant contractor and surety, but reverse as to appellants Robert Wilbur and University Industries.

The relevant facts are as follows. On July 27, 1977, appellant Taylor Pearson, dba Taylor Pearson Construction Company (Taylor Pearson), entered into a contract to develop and construct the University Plaza Shopping Center (University Plaza) in Flagstaff, Arizona. In early July of 1977 Taylor Pearson's construction manager, Tom Short (Short), discussed the excavation and site work for the University Plaza project with Bill Murdock (Murdock) of appellee Murdock-Bryant Construction, Inc. (Murdock-Bryant). Short suggested that Murdock-Bryant bid the job at plan plus one elevation,[1] and on July 15, 1977 Short gave Murdock the site plan and indicated that he wanted Murdock-Bryant's bid right away.

After looking at the site, Murdock-Bryant decided not to submit a bid because

---

1. Grading the project one foot higher than the plans would reduce the total amount of material    to be excavated.

they did not have the time to properly estimate the quantities of rock that would have to be blasted. On July 18, 1977 Murdock told Short of this decision, and Short offered to provide Murdock with the rock quantities. Short then gave Murdock the rock quantities, which included a figure of 34,000 cubic yards of blast rock, and told him that the figures agreed, within two to five percent, with the quantities estimated by the other contractors who had bid on the job, and with the Engineering Testing Laboratories' (ETL) seismic report. Murdock-Bryant asserted at trial that Short knew, at the time he made this representation, that the quantities he supplied to Murdock-Bryant were in fact considerably different from and substantially less than the quantities of rock estimated by the other bidders.

Using Short's quantities, Murdock-Bryant signed a subcontract with Taylor Pearson on August 1, 1977 providing for the blasting of 34,000 cubic yards of blast rock at a total price of $299,285. The work was to be completed by September 23, 1977. Murdock-Bryant arrived at the site the next day, and after some delays (which appear from the record to have been caused by Taylor Pearson) full-scale operations began on August 19, 1977. By August 30, 1977 all the dirt and "rippable" rock that could be removed without blasting had been removed from the site. Murdock-Bryant, in order to meet its deadline, worked continuously at the site utilizing day and night shifts, using lights, paying additional hourly rent on equipment, and paying overtime to employees.

On September 12, 1977, ETL sent a soil report to Taylor Pearson which indicated that a great deal more rock existed on the site than had been indicated on the original ETL seismic report. Neither Murdock nor Murdock-Bryant received a copy of this report, and they continued to work overtime, encountering vast quantities of rock.

On November 9, 1977, Robert Eason (Eason), Taylor Pearson's project superintendent, discovered, after reviewing survey sheets prepared by Taylor Pearson's surveyor Darrel Edwards (Edwards), that 18,-000 cubic yards of rock that had been surveyed had not been included in Taylor Pearson's calculations of the quantity of rock blasted to date, and that Murdock-Bryant had blasted 18,000 cubic yards of rock more than they had billed for. Eason concluded, together with Larry Bryant, that there existed substantially more blast rock on the project than the 34,000 cubic yards quantity upon which the original bid was based, and that this fact explained why the job was progressing so slowly. Murdock-Bryant then requested a meeting with Taylor Pearson representatives.

At the November 14, 1977 meeting, Murdock-Bryant sought assurances that it would be paid for any rock blasted over the five percent variance provided for in the subcontract. After Taylor Pearson refused to give those assurance, Murdock-Bryant walked off the site and filed suit on November 16, 1977 for breach of contract and, alternatively, for rescission and damages in *quantum meruit.*

The complaint demanded payment for the additional rock which had been blasted and removed, the existence of which plaintiffs contended was known or should have been known to Taylor Pearson and which Taylor Pearson concealed from Murdock-Bryant. Since plaintiffs elected to rescind and recover in equity, the jury verdict awarding plaintiffs $392,615, which was in excess of the maximum sum alleged due, was deemed an advisory jury verdict by the trial court. Following the trial, the trial court entered judgment for plaintiffs, on the theories of fraud, negligent or innocent misrepresentation, mutual mistake and lack of mutuality, and awarded damages in *quantum meruit* for $273,042, together with costs and attorney's fees of $135,000. This appeal followed.

Appellants raise four issues on appeal:

1) No reasonable person could find the evidence to be clear and convincing that Murdock-Bryant blasted an additional 18,000 cubic yards of rock;

2) No evidence supports the trial court's holding that Robert Wilbur and University Industries are liable for the

acts of Taylor Pearson either as joint venturers or on a ratification theory;

3) There was not sufficient evidence to support an award of damages of $273,-042.37, which included 10% lost profits of $42,049.30;

4) Murdock-Bryant was improperly awarded attorney's fees pursuant to A.R.S. § 12–341.01.

We will discuss these issues in the same order in which they were raised.

## STANDARD OF APPELLATE REVIEW

The parties agree that the standard of proof for the equitable remedy of rescission in a civil fraud action is one of clear and convincing evidence. Appellants contend, however, that where the trial court's burden of proof is by clear and convincing evidence, the reviewing court has the duty to review the evidence and determine if that higher standard was met. In support of their proposition that the standard of appellate review is also by clear and convincing evidence, they cite *Poley v. Bender*, 87 Ariz. 35, 347 P.2d 696 (1959), and *In re Lamfrom's Estate*, 90 Ariz. 363, 368 P.2d 318 (1962).

Appellants both misunderstand the above cases, and confuse the level of proof required to convince the trier of fact with the standard of review on appeal. In *Hopper v. Industrial Commission*, 27 Ariz.App. 732, 734, 558 P.2d 927, 929 (1976), this court observed:

> The purpose of the "clear and convincing" standard is to guide the trier of fact in the consideration of the evidence. It is not a test to be applied by an appellate court in passing on the sufficiency of the evidence. *Beeler v. American Trust Co.*, 24 Cal.2d 1, 147 P.2d 583 (1944). Therefore the finding of the trier of fact should be sustained if the evidence furnishes reasonable or substantial support therefor. *Murillo v. Hernandez*, 79 Ariz.1, 281 P.2d 786 (1955); *Brown v. Karas*, [73 Ariz. 62, 237 P.2d 799 (1951)]; *King v. Uhlmann*, 103 Ariz.136, 437 P.2d 928 (1968) [Footnote omitted]. Even where the more stringent "beyond

a reasonable doubt" standard is imposed as a guide for the trier of fact, questions concerning the credibility of the witnesses and the weight and value to be given to the testimony are considered as questions exclusively for the jury, *State v. Pieck*, 111 Ariz. 318, 529 P.2d 217 (1974), and the appellate court in reviewing the sufficiency of the evidence is only concerned with whether there is substantial evidence in support of the verdict. *State v. Childs*, 113 Ariz. 318, 553 P.2d 1192 (1976).

*See also, Associated Grocers v. Industrial Commission*, 133 Ariz. 421, 652 P.2d 160 (App.1982).

█ On review, therefore, the quantum of probative evidence required to support the trial court's judgment is the same regardless of what burden of proof was required in the trial court. To hold otherwise would abuse the appellate function, for, as this court recently stated:

> If an appellate court were to apply different standards of review depending on the burden of proof required for the particular proceeding, it would be substituting its resolution of factual issues for that of the trier of fact. Therefore, no matter what the burden of proof required in the proceedings below, we can only review the evidence to determine if there is substantial evidence to support the conclusion of the trier of fact.

*Matter of Appeal in Maricopa County, Etc.*, 132 Ariz. 486, 488, 647 P.2d 184, 186 (App.1982).

## SUFFICIENCY OF THE EVIDENCE TO SUPPORT A FINDING THAT MURDOCK-BRYANT BLASTED AN ADDITIONAL 18,000 CUBIC YARDS OF BLAST ROCK

█ We hold that there was sufficient evidence to support the trial court's finding that Murdock-Bryant blasted an additional 18,000 cubic yards of blast rock. The evidence introduced at trial was conflicting. Murdock-Bryant presented three theories supporting the additional rock's existence, and Taylor Pearson countered with three

other theories explaining why the rock did not exist. In reviewing this evidence, we are governed by the principle that resolutions of conflicts in the evidence, as well as determinations of the credibility of witnesses, are matters within the province of the trier of fact and should not be disturbed on appeal. *Van Emden v. Becker*, 6 Ariz. App. 274, 431 P.2d 915 (1967).

Murdock-Bryant's arguments are based upon survey sheets prepared by surveyor Darrel Edwards, who was hired by Taylor Pearson to measure the amount of rock as it was being drilled and blasted.

Edwards' December 8, 1977 deposition testimony was read into evidence at trial. He testified that figures on *all* of his survey sheets would have to be added up cumulatively to arrive at the total number of cubic yards of rock blasted. He stated that he made no mistakes and that his measurements of the quantities of blast rock were accurate. He mentioned that part of survey sheet No. 9 was missing, and that it should consist of two sheets rather than one. He did not, however, testify that any of the sheets overlapped, and he confirmed that the quantities listed on sheet No. 9 were accurate. While Edwards was not asked to total up the cubic yards of blast rock, Murdock-Bryant submits that the cumulative total of the eleven survey sheets, including the 18,463 cubic yards listed on sheet No. 9, constitutes 53,807 cubic yards of blast rock. The procedure followed by Murdock-Bryant in reaching this total is in accord with Edwards' testimony at his first deposition.

Two years later at a second deposition, dated December 20, 1979, Edwards changed his testimony and stated that he had made a surveying mistake, that sheet No. 2 had overlapped with sheet No. 9, and the two should therefore be considered as one document. He dismissed the 18,463 cubic yards figure as representing "an area south of the area that was going to be blasted and removed." When Edwards then totaled up the eleven sheets, taking the overlap into account, he arrived at a figure of 35,344 cubic yards of blast rock. This excluded the 18,463 cubic yards of rock included in his first deposition.

■ Murdock-Bryant's major theory,[2] and the one they pursue on appeal, is that Edwards' first deposition is the truth. While Larry Bryant testified on cross-examination that sheet No. 9 had to be read in conjunction with sheet No. 2, and that he signed sheet No. 2 on September 15, 1977 with a figure of 3,549 cubic yards, and not 18,463 cubic yards, carried over from sheet No. 9, the trier of fact was free to believe Edwards' first deposition and to reject the explanation in his second deposition that the survey sheets overlapped and that to count them all would be to duplicate figures.

Indeed, as appellees point out, even if the trier of fact believed Edwards' second deposition it may have concluded that Edwards simply failed to survey all the blast rock. Testimony was admitted indicating that Edwards had failed to survey in areas where Murdock-Bryant had drilled and blasted, and Edwards himself admitted that this was possible.

Further, other evidence was admitted indicating that the subcontract estimate of 34,000 cubic yards of blast rock was unreliable and significantly less than the rock quantities estimated by the other bidding

**2.** At trial Murdock-Bryant also argued a second theory, that the extra 18,000 cubic yards came from areas that Edwards did not survey but that Murdock-Bryant had nonetheless blasted, and a third theory, which assumed that Edwards was wrong in the way he laid his survey sheets out. This third theory eliminated the overlap on sheet No. 9 but retained the 18,000 cubic yards by spreading out Edwards' survey sheets like cut-out "paper dolls" in a different configuration. Larry Bryant admitted at trial that the two theories were inconsistent (the third theory finds the additional yardage within the Edwards survey; the second finds it outside of the survey) but plaintiffs were entitled to argue alternative theories that might explain the inconsistencies between Edwards' first and second depositions.

contractors.[3] Taylor Pearson's estimator, Alf Mattson, who reached the subcontract figure of 34,000 cubic yards, testified that he told Tom Short that he had no experience in estimating blast rock, that he felt "very uncomfortable" and "shaky" in estimating the quantities, and that he was not qualified as a site-work excavating contractor.

B.B. Bonner, Jr., a site-work contractor with over forty years experience in the Flagstaff area, testified that he estimated 61,000 cubic yards of blast rock, and that his estimator, Pat Mount, estimated around 59,000 to 60,000 cubic yards. Another bidder estimated 100,000 cubic yards of cut, of which 55,000 was rock that would have to be blasted, and a second contractor testified that his quantities were close to Bonner's. Yet another contractor testified via deposition that his quantities were substantially greater than Mattson's, and that he believed that Taylor Pearson's people had made some estimating mistakes and "shrunk the rock." These estimates are very close to the figure of 53,807 cubic yards of removed rock that Murdock-Bryant reached by totaling up the figures testified to by Edwards in his first deposition.

■ We conclude that the other contractor's estimates, combined with Edwards' first deposition and Larry Bryant's testimony that he blasted in excess of 53,000 cubic yards of rock, provided a sufficient quantum of evidence for the trier of fact to conclude, by the standard of clear and convincing evidence, that Taylor Pearson's estimate of 34,000 cubic yards was unreliable and that Murdock-Bryant did in fact blast the additional 18,000 cubic yards of rock.

■ Given the above, we need not deal with the three scientific theories advanced by appellants at trial to prove that the amount of blast rock had not been misrepresented. Conflicting evidence was introduced as to the reliability of all theories—survey, powder factor, grid factor, and aerial photogrammetry—and we shall not disturb the trier of fact's determinations of the credibility and weight to be accorded the evidence, nor its resolutions of conflicts in the evidence. *Van Emden, supra.* We hold that a sufficient quantum of probative evidence was presented to the trier of fact, and on appeal we shall not disturb the trier of fact's application of the burden of proof to that evidence. *Hopper, supra.*

## ROBERT WILBUR AND UNIVERSITY INDUSTRIES

Appellants next contend that Robert Wilbur[4] (Wilbur) and University Industries were not joint venturers with Taylor Pearson and that no evidence was introduced at trial to support the judgment against them.

We agree with appellants that the evidence at trial was insufficient to find either Robert Wilbur or University Industries liable for Short's misrepresentation to Murdock on July 18, 1977. The evidence in the record is insufficient to prove either that a joint venture agreement existed prior to the July 18 misrepresentation, or that Wilbur or University Industries ratified or adopted any of Short's misrepresentations with full and complete knowledge of the misrepresentation.

■ The record shows that Short's misrepresentation to Murdock occurred on July 18, 1977. The sole bases placed into evidence to support a joint venture were a July 28, 1977 indemnity agreement executed by University Industries in favor of

---

3. These estimates were at plan elevation, not plan plus one. Testimony was introduced that adding one foot to the elevation would reduce the cut by about 10 percent, yielding figures still much higher than 34,000 cubic yards of blast rock.

4. Robert Wilbur entered into a relationship with Taylor Pearson regarding University Plaza, but the record is unclear as to his other affiliations. Indeed, both of the parties and the judge below were in some confusion as to whether Wilbur had a relationship with University Industries and whether both or just one of those parties had a relationship with Taylor Pearson.

appellant Insurance Company of North America (INA) allowing Taylor Pearson to obtain a construction bond, and an August 4, 1977 letter from Wilbur to Taylor Pearson describing their agreements as to Wilbur's participation in the University Plaza project, and promising that "I shall cause a construction bond to be issued ..."

Appellees argue that the August 4 letter merely reduced to writing an agreement that had been previously reached. The only evidence presented indicating that this agreement was reached prior to the July 18 misrepresentation was Taylor Pearson's testimony that University Industries had indemnified him with INA on two previous construction projects, and his testimony that he had negotiated the agreement with University Industries in June or July of 1977. The first evidence of a binding agreement, however, was the August 4 letter. We find the above evidence insufficient to establish that a joint venture existed prior to August 4, and conclude, as a matter of law, that no joint venture existed on July 18, 1977, the date of the misrepresentation.

■■■ Nor is there sufficient evidence in the record to support a ratification. Ratification requires that a principal have full and actual knowledge of all material facts at the time he, by subsequent act or conduct, binds himself to a previously unauthorized act of an agent. *Phoenix Western Holding Corporation v. Gleeson*, 18 Ariz.App. 60, 500 P.2d 320 (1972). Ratification is thus based upon full knowledge of all the material facts. *United Bank v. Mesa N.O. Nelson Co.*, 121 Ariz. 438, 590 P.2d 1384 (1979). Neither Murdock's testimony regarding the misrepresentation nor any other evidence even hints that Wilbur or University Industries ever knew of the misrepresentation. While Wilbur had the contractual right to inspect "copies of the construction contract, estimates prepared for the project ... as well as plans and

specifications," no evidence indicates that he had *actual* knowledge of the misrepresentation. Furthermore, ratification cannot occur in law unless a contract or joint venture is already in existence, and we have already excluded these possibilities.

We therefore conclude that as a matter of law Robert Wilbur and University Industries are not liable for the July 18 misrepresentation of Taylor Pearson, and that their motions for directed verdicts should have been granted by the trial court.

## DAMAGES IN QUANTUM MERUIT

Taylor Pearson next contends that the award of *quantum meruit* damages was excessive and not supported by the evidence.

The jury was instructed [5] that:

> In the event you find that Plaintiffs are entitled to recover damages, I instruct you that Plaintiffs in this case are seeking compensation under a theory known as quantum meruit. Under this theory, the measure of relief to which Plaintiffs would be entitled is the reasonable value to the Defendants of the work done by the Plaintiff Murdock-Bryant. In assessing any such benefit, you may consider what it would cost the Defendants to obtain the same services from another subcontractor under the same or similar circumstances.

> If a person is damaged by the misrepresentation of another, as I have defined that term in these instructions, that person is entitled to recover, in addition to his compensation under quantum meruit, such other additional damages as might be required to make him whole. These damages must have been reasonably and necessarily incurred under the circumstances.

The jury returned a $392,615 verdict for Murdock-Bryant, which the jury foreman in an affidavit said was an attempt to make

---

**5.** While the jury verdict was advisory, the instruction is pertinent because it shows how the trial judge viewed the law on recovery of damages in *quantum meruit*.

the plaintiffs "whole" by awarding interest (a ten percent inflation factor), attorney's fees, a ten percent profit, and Murdock-Bryant's initial capitalization of $50,000. Taylor Pearson, in a motion to reduce the jury verdict, asked that Murdock-Bryant be awarded only $230,993, computed as plaintiffs' total expenses of $420,493 minus the amount already paid by Taylor Pearson to Murdock-Bryant of $189,500.

The trial judge treated the jury verdict as advisory, and awarded Murdock-Bryant $273,042 (together with costs and attorney's fees of $135,000). This figure, $273,042, is reached by taking Murdock-Bryant's total costs of $420,493 and adding a ten percent profit factor to reach $462,540, then subtracting the $189,500 already paid to Murdock-Bryant by Taylor Pearson. The trial judge thus eliminated interest, attorney's fees, and plaintiffs' $50,000 initial capitalization from the recovery.

On appeal Taylor Pearson first objects to Murdock-Bryant's figure of $420,492.97 for their total costs, and cites *Spitalny v. Tanner Construction Co.*, 75 Ariz. 192, 200, 254 P.2d 440, 446 (1953), *overruled on other grounds, Schwartz v. Schwerin*, 85 Ariz. 242, 250, 336 P.2d 144, 149 (1959), for the proposition that in a *quantum meruit* recovery:

> [T]he measure of the value of the services rendered must be the value to the defendants, not the cost to the plaintiff in performing such services.

Thus Taylor Pearson argues that Murdock-Bryant's costs cannot be considered in determining the reasonable value of the services rendered to Taylor Pearson.

"Costs" and "value" constitute a much-debated area of the law of damages, and one that has not been fully addressed in Arizona. While the plaintiff's costs do not necessarily reflect the value of the benefit conferred upon the defendant, the general consensus of opinion is that plaintiff's reasonable costs may represent some evidence of value, but they do not necessarily represent a recoverable item of restitution in and of themselves. D.B. Dobbs, *Handbook on The Law of Remedies* § 4.5 at 261 (1973) (Dobbs).

Many courts, however, do use plaintiff's costs as a measure of the value to the defendant. Indeed, in *Spitalny*, the court affirmed plaintiff's award of damages, which in effect included plaintiff's costs, on the basis that "There is nothing in the evidence ... to show that the value of the services to defendants was not equal to the amount of the claim of plaintiff." 75 Ariz. at 200; 254 P.2d at 446. In *Ruck Corp. v. Woudenberg*, 125 Ariz. 519, 522, 611 P.2d 106, 109 (App.1980), Division Two of this court permitted a contractor to "recover in quantum meruit for the value of the *services* and *expenses* reasonably incurred in good faith." (Emphasis added). The court awarded the contractor its "net cost" for steel components and its other expenses, and affirmed a portion of a trial court award of the reasonable value of labor and materials furnished. Without explicitly saying so, Division Two found the plaintiff's costs to be the proper measure of the benefit to the defendant. *See also City of Portland, Etc. v. Hoffman Const. Co.*, 286 Or. 789, 801–803, 596 P.2d 1305, 1313–1314 (1979) (proper measure is not value of the benefit conferred upon defendant, but rather the reasonable value of the contractor's work itself which is a market value measure and not a reimbursement for actual costs); *Petropoulos v. Lubienski*, 220 Md. 293, 152 A.2d 801 (1959) (reasonable value of services actually performed, labor, and outlays for materials furnished and work done). Courts have consistently awarded contractors the cost of their performance on a *quantum meruit* theory, usually measured at their objective market value. Dobbs § 12.24 at 915. The contractor's costs should also include all his indirect costs, such as overhead. *Id.; Petropoulos, supra; City of Portland Etc., supra;* C.T. McCormick, *Handbook on the Law of Damages* § 165 at 644 (1935) (McCormick).

The United States Court of Appeals for the Fifth Circuit, in a case remarkably sim-

ilar to this one, has held that the benefit to the defendant is not the proper measure of the reasonable value of the services. In *U.S. v. Stringfellow*, 414 F.2d 696 (5th Cir.1969), the court held that the district court properly determined the reasonable value of dirt excavation work performed by plaintiff subcontractor and affirmed the district court's *quantum meruit* award. Recognizing that the district court was not able to use a precise mathematical formula based upon direct evidence, the fifth circuit held that:

> The value of West's (the subcontractor) performance is to be determined "not by the extent to which [Stringfellow's (the contractor)] total wealth has been increased thereby, but by the amount for which such services and materials as constituted the part performance could have been purchased from one in [West's] position at the time they were rendered." Restatement of Contracts § 347, comment *c* (1932), and the costs of such performance are relevant to this determination. *E.g.*, United States ·for Use of Susi-Contracting Co. v. Zara Contracting Co., 2 Cir.1944, 146 F.2d 606.

414 F.2d at 700.

Commentators have also hypothesized about the situation *sub judice*. In Professor McCormick's treatise, § 165 at 642, he states:

> The builder may recover for part performance (a) as an element of damages in an action on the contract based on the second or third formulas mentioned in the next previous section; (b) in an action for *quantum meruit*, relying again on the contract; (c) in an action for *quantum meruit* after rescinding the contract.
>
> In all of these types of action, except the suit under the third formula where the proportionate part of the price is sought, the normal measure of recovery is the actual cost of the work. In ascertaining the cost of the work done and of the prospective cost of completing the job, account must be taken not only of the ordinary cost of labor and material, but of the cost of supervision, including the plaintiff's own services in the case of an individual builder, use of tools and equipment, insurance, and office expense.

Professor Dobbs, § 4.5 at 263, states:

> ... [S]uppose the contract price does not govern the case because the contract is rescinded for mistake or fraud, and the defendant has improvements he bargained for. The labor and materials are reasonably worth $10,000, but the land value is increased only by $5,000, because the work ordered by the defendant is ill-suited to the land. In this case the defendant may well be charged with the reasonable value of the goods and services he bargained for, even though this exceeds the increase in his land value. (Footnote omitted).

\* \* \* \* \* \*

> As a practical matter, this situation is most apt to arise where there are price mistakes, and it may be much simpler to hold the defendant liable for the reasonable value of the goods and services.

"Value" has also proven to be an elusive term, and the courts have admittedly had difficulty in computing the reasonable value of the service to the defendant. Professor Dobbs has observed that:

> If there is any one rational principle that might be used to guide restitutionary measurements it is that the measure of restitution should reflect the substantive law purposes that call for restitution in the first place.

Dobbs § 4.5 at 260. Here, *sub judice*, restitution is called for to remedy fraud, and negligent or innocent misrepresentation. Under these circumstances, we find it proper both to measure the benefit conferred upon Taylor Pearson by the market value of Murdock-Bryant's labor and materials, and to hold that Murdock-Bryant may recover the reasonable costs of its perform-

ance, including indirect costs such as overhead. *See Restatement of Restitution* § 152 (1937) (stating that where a person is entitled to restitution from another because the other has obtained his services by fraud, the measure of recovery for the benefit received by the other is the market value of such services irrespective of their benefit to the recipient). Under the circumstances we shall not disturb the trial court's finding that Murdock-Bryant incurred $420,492.97 in total costs.[6]

■ Appellants also contend that no admissible evidence supports the $420,492.97 cost figure because no expert testimony supports the trial court's findings regarding the reasonable value of Murdock-Bryant's services. Appellants rely upon *Blecick v. School District No. 18 of Cochise County*, 2 Ariz.App. 115, 406 P.2d 750 (1965) and *Sorenson v. Robert N. Ewing, General Contractor*, 8 Ariz.App. 540, 448 P.2d 110 (1968) for their argument that an expert must be used to establish the *quantum meruit* value of the services bestowed upon defendant. Those cases, however, dealt with the cost of repairs, not construction site work, and required the opinion testimony of a person "qualified in the class of work in question." *Blecick*, 2 Ariz.App. at 122, 406 P.2d at 757. The record before us contains ample evidence that both Larry Bryant and Bill Murdock were, if not formal rock or demolition experts, at the very least qualified in site excavation work, and we find that their testimony was probative on the question of the reasonable value of the services rendered.

■ Appellants next contend that the amount awarded wrongfully includes lost profits. We agree with appellees that a reasonable profit margin is a proper ele-

ment of a *quantum meruit* award, because (as appellants admit) a reasonable profit is an element of the reasonable value of services rendered. *See City of Portland Etc., supra* and authorities cited therein at 286 Or. 803, 596 P.2d 1314; *Olberding Const. Co. Inc., v. Ruden*, 243 N.W.2d 872, 878 (Iowa 1976); *Lester N. Johnson Co., Inc. v. City of Spokane*, 22 Wash.App. 265, 275, 588 P.2d 1214, 1220 (1978); *Central Steel Erection Co. v. Will*, 304 F.2d 548, 555 (9th Cir.1962) (applying Washington law). *But see Petropoulos, supra*, (error to include a positive profit of 10% in a *quantum meruit* award). In our opinion any *quantum meruit* award, be it viewed as the reasonable value of services rendered or as the costs incurred by the subcontractor, would encompass what the contractor would have had to pay another subcontractor to do the work performed. This invariably includes a profit.

We reject appellants' contention, based on *Ruck Corp., supra*, 125 Ariz. at 522, 611 P.2d at 109, that there can be no lost profits where there is no contract to base them on. *Ruck Corp.* is distinguishable, because there a contract *never* came into existence due to the failure of a condition precedent, whereas in the case *sub judice* a contract *was* in existence until it was rescinded.

■ We find that a reasonable profit margin is inherent in the value of the services rendered, that both Murdock and Bryant were qualified to testify that the fair and reasonable profit margin was ten to fifteen percent, and affirm the award of ten percent lost profits.

Appellants next contend that the amount awarded as damages is excessive because it exceeds the contract price, and cite *Dey v. Hill*, 20 Ariz. 466, 468, 181 P. 462, 462

---

**6.** We recognize that the reasonable value of the services and materials is a reflection of fair market value and not of costs. *See* Dobbs § 4.5 at 272; *City of Portland, Etc., supra*, 286 Or. at 803, 596 P.2d at 1314. The jury instruction given indicates that the trial judge favored a fair

market value computation and the record contains extensive documentation of Murdock-Bryant's payments on the University Plaza project, which total $420,492.97. We believe these costs do reflect the fair market value of Murdock-Bryant's services and materials.

(1919) for the proposition that a party to a fully executed contract may recover in *quantum meruit* for the reasonable value of his services, but in no event more than the contract price. *Dey* is distinguishable from this case because the subcontract *sub judice* was not fully executed—indeed, in *Dey* our Supreme Court observed that if the parties had abandoned the contract, then the contract price would not place a ceiling on the plaintiff's *quantum meruit* recovery. *Id.*

We do recognize, however, that the question of whether the contract price places a ceiling on a *quantum meruit* recovery has been much debated. *See, e.g.,* Dobbs § 4.5 at 269–273, § 12.1 at 794–795, § 12.24 at 915–918; Palmer, *The Contract Price as a Limit on Restitution for Defendant's Breach,* 20 Ohio St. L.J. 264 (1959); Patterson, *Builder's Measure of Recovery for Breach of Contract,* 31 Colum. L. Rev. 1286, 1300–1303 (1931). Many courts, in certain circumstances, permit a contractor to recover in excess of the contract price. *See, e.g., Johnston v. Star Bucket Pump Co.,* 274 Mo. 414, 202 S.W. 1143 (1918); *Smith v. Brocton Preserving Co.,* 251 A.D. 102, 296 N.Y.S. 281 (N.Y.App.Div.1937). Indeed, Professor McCormick has observed that the better view does not limit the builder's recovery to the contract price. McCormick § 166 at 645. *See also Scaduto v. Orlando,* 381 F.2d 587, 595 (2d Cir. 1967).

In *Clark v. Mayor of New York,* 4 N.Y. 338 (Comstock 1850), when the site excavation was more expensive than had been envisioned per cubic yard, the builder was allowed to collect more than the contract price for his performance. In *U.S. v. Stringfellow, supra,* while the original subcontract provided for dirt removal at $.45 per cubic yard, the *quantum meruit* award of $1.15 per cubic yard was deemed proper because of unanticipated difficulties

that the subcontractor had encountered—namely, discovering, as work progressed, that more soil had to be moved than was originally contemplated. The fifth circuit observed that as a result of these on-site difficulties:

> [T]he costs incurred would obviously be significantly higher, and the reasonable value of the work would be similarly greater.

414 F.2d at 700.

In this case, Murdock-Bryant likewise encountered onsite difficulties not envisioned by the subcontract, and incurred additional expenses as a result. We find that here the reasonable value of the services rendered to Taylor Pearson was higher than the contract price, and that under the circumstances, Murdock-Bryant may recover for those services.[7]

Appellants next claim that the award is excessive because it exceeds the fair market value of substitute performance, as measured by the bids submitted by other contractors which envisioned rock quantities equal to those actually blasted by Murdock-Bryant. We reject this argument because the other bids could not anticipate, and therefore did not include, Murdock-Bryant's additional and unexpected costs resulting from the fraud and misrepresentation.

## ATTORNEY'S FEES

Appellants' final issue on appeal is the claim that Murdock-Bryant was improperly granted attorney's fees pursuant to A.R.S. § 12–341.01. We find appellants' reliance on *Amphitheater Public Schools v. Eastman,* 117 Ariz. 559, 574 P.2d 47 (App.1977) to be misplaced, and observe that in any event the *Amphitheater* decision has been significantly eroded. *See Sparks v. Republic Nat. Life Ins. Co.,* 132 Ariz. 529, 543, 647 P.2d 1127, 1141 (1982),

---

**7.** In so holding we note that we are not adopting the common argument that since the contract was rescinded it no longer exists, and therefore it cannot provide a price limiting the contractor's recovery. *See, e.g., Boomer v. Muir,* 24 P.2d 570 (Cal.App.1933).

*cert. denied,* 103 S.Ct. 490, 103 S.Ct. 490, 74 L.Ed.2d 632 (1982). We likewise reject appellants' argument that because of the rescission, there was no contract upon which to base an A.R.S. § 12–341.01 attorney's fees award. In *Ruck Corp., supra,* Division Two of this court affirmed a fee award based on A.R.S. § 12–341.01 in a *quantum meruit* case where a contract *never* came into existence. We hold that the action *sub judice* arose out of a contract within the meaning of A.R.S. § 12–341.01, and affirm the award of attorney's fees.

For the above reasons, the judgment is reversed with respect to Robert Wilbur and University Industries, and affirmed in all other respects. Robert Wilbur, University Industries and the appellees are awarded attorney's fees as the successful parties on appeal pursuant to A.R.S. § 12–341.01 and Rule 21(c)(1), Arizona Rules of Civil Appellate Procedure.

GRANT, P.J., and HAIRE, J., concur.